Grand Trunk Western Railroad Company, a Corporation, Appellant, v. M. S. Kaplan Company, a Corporation, Chicago and North Western Railroad Company, a Corporation, and the Indiana Harbor Belt Railroad Company, a Corporation, Appellees.

Gen. No. 48,668.

First District, Second Division.

September 17, 1963.

Winston, Strawn, Smith & Patterson, of Chicago (Edward J. Wendrow and R. Lawrence Storms, of counsel), for appellant.

Blanksten and Lansing, of Chicago (Bernard M. Kaplan, of counsel), for appellee, M. S. Kaplan Company, and Robert W. Russell and George Kaye, of Chicago, for appellee, Chicago and North Western Railroad Company, and Richard O. Olson, Alvin E. Domash, and Thomas J. Healey, all of Chicago, for appellee, Indiana Harbor Belt Railroad Company.

MR. JUSTICE FRIEND delivered the opinion of the court.

Plaintiff brought suit for damages resulting from the derailment of its passenger train No. 6, alleged to have occurred when it ran over railroad scrap which had fallen from the earlier Indiana Harbor Belt train

No. 9004. Defendant Chicago and North Western Railroad (North Western) is charged with having furnished gondolas for train No. 9004 which had large holes in their bottoms. M. S. Kaplan Company (Kaplan), a scrap dealer and dismantler of railroad equipment, is charged with negligence in loading these gondolas with their cargo of railroad scrap. The Indiana Harbor Belt Railroad (I. H. B.) is charged with negligence in permitting scrap to fall from its train onto plaintiff's tracks, and with failure to remove it. All defendants are charged with negligence in failing to make proper inspections of the gondolas. Plaintiff appeals from judgments entered upon directed verdicts for each of the defendants at the close of plaintiff's case.

The derailment occurred at 11:32 p. m. on December 22, 1954 as plaintiff's train crossed the B. & O. diamond near Blue Island, Illinois. This diamond, as it is called, consists (in approximate compass direction) of plaintiff's parallel northbound and southbound lines, intersected by the eastbound and westbound lines of the Baltimore and Ohio Railroad.

Approaching the diamond in a southerly direction at approximately fifty miles per hour on the night in question, plaintiff's fireman saw, dimly, about a hundred feet ahead on the tracks and a few feet south of the diamond, what looked like a wooden two-by-four. As the train crossed the diamond a second later, a shower of sparks went up, and the fireman called for an emergency stop. The derailed train, still partially on the tracks, jolted to a stop about 2000 feet south of the diamond. There were no bodily injuries, and a search was begun for the cause of the derailment. Four large pieces of railroad scrap, consisting of cut up railroad wheels, were found, strewn south of the diamond near the path of the derailed train. These

pieces bore the marks of a dismantler's torch and ranged in weight from forty-seven pounds to over one hundred pounds. They could be fitted together to form two larger pieces. The piece found "just south" of the diamond fitted together with the piece found four or five hundred feet south of the diamond. The piece found twenty feet south of the diamond fitted together with the piece found forty feet south of the diamond, apparently between the rails used by the derailed train. A few timbers were also found in the area, along with some smaller pieces of debris, but the shower of sparks which went up when plaintiff's engineer passed through the diamond convinced him that he had struck metal, not wood. While searching for the cause of the derailment, one of plaintiff's witnesses noticed that a fresh break appeared on one of the pieces of railroad wheel found in the area.

Plaintiff argues forcefully that the derailing material must have come onto the southbound tracks after 8:52 p. m., at which time one of its trains used the southbound tracks over the diamond without incident. Plaintiff's evidence indicates that, from 8:52 p. m. until the derailment, twenty trains crossed the diamond. None, however, used the southbound tracks. After No. 9004 crossed the diamond at 9:37 p. m. on the eastbound B. & O. tracks, the next train to use the southbound tracks was plaintiff's train No. 6, derailed at 11:32 p. m. At this time plaintiff's employees began the search which led to the discovery of the above described pieces of railroad scrap.

Plaintiff asserts that the scrap weight reports for train No. 9004 show a cargo loss in transit, and that this is a further circumstance indicating that the scrap found near the diamond came from defendants' train. Weight reports were individually prepared for each gondola. We have summarized these figures for

233

the entire load of scrap, for the sake of convenience and because the parties base this portion of their argument on the total figures.

After being loaded by the locomotive dismantler Kaplan, the gondolas were weighed by North Western at its Proviso Yard. From the total gross weight (1,539,800 pounds) the empty weight of the gondolas (546,700 pounds) was subtracted to determine the net weight of the scrap (993,100 pounds) as loaded by Kaplan. This poundage was used by Kaplan as a basis for billing the consignee, Inland Steel Company (Inland).

Upon arrival at Inland, the loaded gondolas were first weighed, then emptied, and again weighed when empty. The scrap weight received at Inland was determined by subtracting the empty weights of the gondolas (557,860 pounds) from their gross weights (1,537,920 pounds) before unloading. As shown by relevant documents, the scrap weight received by Inland (980,060 pounds) was 13,040 pounds less than the scrap weight at Proviso, which plaintiff says shows a scrap loss in transit of this amount.

Defendants argue that most of this 13,040-pound scrap loss is illusory. They point out that the total empty weight of the gondolas was 11,160 pounds greater at Inland than at Proviso, and assert that this increased empty weight is responsible for most of the decrease in scrap weight between Proviso and Inland, since the result of subtracting a larger empty gondola weight from the gross weight of the gondola will be a decrease in the computed weight of scrap delivered which is not due to an actual loss of scrap. Accordingly, defendants would adjust, i. e., reduce plaintiff's 13,040-pound scrap loss by the amount of the increase in the weight of the empty gondolas between Proviso and Inland. This 11,160-pound adjustment would produce an adjusted scrap loss of 1880 pounds. The summarized computations of the parties are shown below:

234

WEIGHTS SHOWN BY RELEVANT DOCUMENTS:

| | Proviso | Inland |
|---|---|---|
| Gross weights (gondolas filled) | 1,539,800 | 1,537,920 |
| (less) Empty weights | (546,700) | (557,860) |
| Scrap weight, each location | 993,100 | 980,060 |

SCRAP LOSS COMPUTATIONS:

| | | |
|---|---|---|
| Scrap weight at Proviso | | 993,100 |
| (less) Scrap weight at Inland | | (980,060) |
| Scrap loss computed by plaintiff | | 13,040 |
| Defendants' adjustment to this loss: | | |
| Empty gondola weights at Inland | 557,860 | |
| (less) Empty weights at Proviso | (546,700) | (11,160) |
| Defendants' adjusted scrap loss | | 1,880 |

Defendants point to several alternative explanations for the increase in empty gondola weights. However, not all these alternatives are consistent with defendants' 11,160-pound adjustment to the 13,040-pound loss claimed by plaintiff. On the one hand, it is suggested that the 11,160-pound increase in gondola weight may have been due to scrap dregs being left in the bottoms of the gondolas after unloading at Inland. If so, defendants' adjustment is proper, since such scrap is not lost in transit. On the other hand, defendants are also willing to adopt without differentiation the alternative explanation that the weight increase may be due to accumulations of water, ice, and snow on the gondolas between the weighings at Proviso and Inland. If this is the source of the increase in empty gondola weights then defendants' adjustment is improper because such a weight augmentation would

235

equally affect both the gross and empty weights at Inland, and would not produce an illusory loss which required adjustment. Finally, defendants argue that the differences in scrap weights may be the result of scale variations between Proviso and Inland. While there is testimony that such variation is a possible explanation of a decrease in cargo weights, there is no evidence that such a variation actually existed between these two sets of scales. Similarly, there is testimony that scrap was sometimes left in the bottoms of gondolas during unloading, but there is no evidence that this happened here; nor is there any but a fleeting reference in the evidence as to weather conditions (not mentioned by the parties) during this period, so that there is no real basis for assuming that accumulations of ice or snow were present on these gondolas. Thus, while there are indiscriminate suggestions in the record that any of the indicated causes (along with several others) "could" have caused an illusory loss of scrap, there is no specific evidence to indicate that any of these alternatives should prevail over plaintiff's argument, based on the weighing reports, that the decrease in scrap weight is due to an actual loss of scrap.

Absent such contrary evidence, we hold that plaintiff's evidence indicates, prima facie, a scrap loss of 13,040 pounds which a jury might properly consider as further evidence tending to show that the scrap found at the diamond came from defendants' train. This position is supported by decisions based on almost identical questions. Smith v. Louisville & N. R., 202 Iowa 292, 209 NW 465 (1926), was an action for loss of cargo brought by a shipper of coal against the carrier railroad, in which the plaintiff's proof of an actual cargo loss consisted of differences in the weights of coal as shown by relevant documents at the points of shipment and destination. The defendant railroad

introduced evidence that coal lost different percentages of its weight through evaporation under different weather conditions, but offered no specific evidence as to the probabilities of evaporation or absorption under the particular weather conditions existing at the time of the shipment. It was held (p 467) that the trial court did not err in disregarding the defense that evaporation was the cause of the shortage. A similar result obtained in Joseph Toker Co. v. Lehigh Valley R., 12 NJ 608, 97 A2d 598 (1953), also an action for loss of coal based upon weight decreases from the point of departure to the point of destination, in which the defendant advanced explanations for the losses very similar to the explanations put forth by the defendants in this case. In rejecting the railroad's argument that scale variations or weather conditions might have caused the decline in weights, the court said (97 A2d 600–1):

> ". . . there is no legal evidence disputing the accuracy of the weights taken and recorded by the carriers at origin and destination, although the contention is advanced that the weight deficiencies may possibly have been due to weighing inaccuracies resulting from differences in scales, atmospheric conditions and methods of weighing at origin and destination. *But this is wholly speculative and is not supported by evidence that in the particular case before us there were any such actualities resulting in variations. . . .*" (Emphasis ours.)

Defendants next assert that weight losses under one percent must be ignored as inconsequential, this being the percentage of weight variation which plaintiff railroad requires its own shippers to accept as the basis for freight charges, without reweighing. This contention overlooks the fact that we are now in the

course of litigation, not in the course of trade. It matters little to our present purposes that plaintiff and other railroads find it convenient to eliminate small claims for freight with a one percent rule. Any other holding would change plaintiff's working rule of convenience into an unintended admission of fact. Plaintiff's one percent rule is clearly not relevant to the issues before us here. Joseph Toker Co. v. Lehigh Valley R., 12 NJ 608, 97 A2d 598, 601-2 (1953).

 Two or three weeks after the derailment, plaintiff's agent McKeon visited the Inland freight yard for the purpose of inspecting the gondolas used in defendants' train No. 9004. All but one of these gondolas had been shipped out and could not be located, but this remaining gondola was found to have large holes in its bottom which had been partially covered with boards, but through which scrap might easily have fallen. This was also true of another one of these gondolas which had been returned to North Western's Proviso Yard. Plaintiff offered to prove through this witness that the perimeters of the holes in these gondolas were worn and weather stained and of the same appearance as the rest of the flooring. Defendants objected to any evidence respecting these holes, on the grounds that "presumptions do not relate backward." This objection was sustained by the trial court. We think that a jury might well infer from the described appearance of these holes that they had existed for a long period of time, certainly since the loading of train No. 9004 and its passage over the B. & O. diamond on the evening of December 22, 1954. There is not and there cannot be any hard and fast rule of exclusion for evidence of this kind. Whether evidence of a condition properly "relates backward" depends upon the character of the condition itself, whether permanent or transitory; upon the apparent likelihood of intervening alteration, through natural forces or hu-

man interference; and finally upon the length of time which the inference of unchanged condition must span. 2 Wigmore, Evidence § 437 (3d ed 1940). In City of Bloomington v. Osterle, 139 Ill 120, 28 NE 1068 (1891), a case similar to the one before us, it was held (pp 122–123) that the existence of rotten stringers in a sidewalk examined two weeks after the accident was evidence the jury could consider in determining the condition of the sidewalk at the time of the accident; the court noted that the stringers in question could not have rotted within a two-week period. In the case before us, the inference is reasonable, and that is sufficient for admissibility. Gass v. Carducci, 37 Ill App2d 181, 190, 185 NE2d 285 (1962).

Plaintiff concedes that its evidence is wholly circumstantial. To reach the jury with such a case, it must appear that this evidence, taken with its intendments most favorable to plaintiff, establishes a reasonable conclusion that defendants are at fault. Lindroth v. Walgreen Co., 407 Ill 121, 130–135, 94 NE2d 847 (1950). It is not seriously denied by any of the defendants that the factual averments of the complaint, if proven, do establish a cause of action based on negligence; hence the ultimate issue for our consideration is whether a jury might reasonably conclude that the derailment was caused by railroad scrap iron which came from defendants' train.

It unequivocally appears from the testimony of plaintiff's fireman Convis that the derailment began just south of the diamond as his train struck some object which gave off sparks which indicated that it was metallic. In view of these facts it is a coincidence of considerable magnitude that, after the derailment, three large pieces of railroad scrap should be found in the area of the initial derailment, that one of them should appear "freshly broken," and that, during the exhaustive search for derailing objects which extended

239

into the following day, nothing else was found which was likely to have caused the derailment. We think that a jury might properly conclude that the derailment was caused by an encounter with these pieces of railroad scrap. It is fully consistent with such an occurrence that a piece of locomotive tire, which fitted together with a piece found near the diamond, should be found farther down the tracks, carried along by the onrush of the derailed train.

From the uneventful passage of plaintiff's earlier southbound train at 8:52 p.m., it must of course be reasoned that the derailing scrap came onto the southbound tracks after 8:52 p.m. Plaintiff offers several lines of evidence to substantiate its claim that this scrap, inferably the cause of the derailment, did fall from defendants' train No. 9004. Plaintiff first shows that none of the trains using its northbound tracks after 8:52 p.m. carried railroad scrap. Several of the trains using the B. & O. tracks over the diamond were shown not to be carrying railroad scrap. However, it is true that the cargoes of some of the trains using the diamond on the B. & O. tracks remain unaccounted for; it is also true that the only train shown to have carried railroad scrap on the night in question was No. 9004. To this must be added the improperly excluded evidence that two of the gondolas in this train were found to have large holes in their bottoms through which scrap might easily have fallen, together with plaintiff's showing that this train did lose over six tons of railroad scrap in transit. We believe that a jury might properly prefer plaintiff's explanation that defendants' train was the source of the scrap near the diamond, to an indeterminate possibility that some other train crossed the diamond after 8:52 p.m. carrying a similar cargo of railroad scrap and dropped the pieces of scrap found after the derailment.

Defendants offer several related arguments in support of the directed verdict in their favor. First, they

assert that the evidence permits alternative explanations for the derailment which are equally as probable as the explanation put forth by plaintiff.

In the search following the derailment, Vincent Sciara, unemployed, was found sleeping on the floor of plaintiff's signal tower, close by the diamond. He was arrested for trespassing by plaintiff's detectives, and rigorously questioned about the derailment. Apparently in response to the questioning Sciara stated that the derailment could not be "pinned" on him, and suggested that an improperly set switch might have caused the derailment. There being no evidence against him, Sciara was released from custody. Nevertheless, defendants conclude from Sciara's comments that he had "previous experience" with derailments, and they hint that he may be the "villain" who derailed the train. If Sciara did sabotage the rails, it is strange that he so promptly went to sleep in plaintiff's signal tower, rather than staying awake to watch the "fun"—from a distance. There is, however, no evidence that Sciara was anything but what he appeared to be, an unfortunate hobo who sought a night's refuge on plaintiff's right of way.

It is further suggested that the derailment may have been caused by a wooden two-by-four, an improperly set switch, or loose spikes in the rails at the diamond. The suggestion that a two-by-four may have caused the derailment is based on the testimony of plaintiff's fireman that the derailing object looked like a two-by-four as he glanced at it from a distance before the derailment. The subsequent testimony of this witness discredits this possibility. The other alternative explanations are based on the testimony of witnesses to the effect that such conditions as a thrown switch, if present, "could" or "might" cause a derailment. There is no evidence to suggest that such conditions were in fact present at the diamond on the day of the derailment.

On the record, the defendants' alternative explanations of the accident are nothing more than bare possibilities. To give them credence would require that we indulge the very kind of speculation we have been urged to ignore.

██ Defendants urge that plaintiff's case must fail because it bases "an inference upon an inference." They cite several decisions of our Supreme Court, together with a listing of twenty-one Appellate Court decisions, which have employed this formula in rejecting sequential inferences found to be untenable. Such a sweeping exclusionary formula is of doubtful analytical value in the decisional process. It serves only as a convenient repository for rejected inferences. As stated in 1 Wigmore, Evidence § 41 (3d ed 1940, pp 435–436):

> "There is no such orthodox rule [against basing an inference upon an inference]; nor can be. If there were, hardly a single trial could be adequately prosecuted. . . . . The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon." (Footnotes omitted.)

In Plodzien v. Segool, 314 Ill App 40, 43–45, 40 NE2d 783 (1942), the court relied on the quotation from Wigmore above set forth, in rejecting the theory that an inference cannot be based upon an inference. The court also quoted with approval the sensible position taken in Sturm v. Employers' Liability Assur. Corp., Ltd., 212 Ill App 354, 363 (1918), where the court said that "an inference from an inference, and then a third and fourth may, under certain circumstances, be admissible (Ohio Bldg. Safety Vault Co. v. Industrial Board, 277 Ill 96, 115 NE 149 [14 NCCA 224]), but the

more remote the inference the more enfeebled its probative force." We adopt the position taken in these authorities; the pertinent consideration is whether the inference based on an inference is reasonable.

It is urged that we must uphold the directed verdict for defendants on the ground that a reasonable man could not find more probable plaintiff's evidence that its train was derailed by scrap from defendants' train than competing contentions which are consistent with plaintiff's evidence. We do not accept the interpretation which defendants have placed on the cases they cite.

The competing contentions emphasized by defendants create no parallel between the instant case and Shaw v. Swift & Co., 351 Ill App 135, 114 NE2d 330 (1953). There a verdict for the plaintiffs based upon food poisoning was reversed, since at best, under the plaintiffs' evidence, the verdict against the defendant could have been based only upon a blind choice among several equally probable sources of bacterial contamination. Nor is this a case in which plaintiff has totally failed to supply evidence from which it might be inferred that defendants, rather than some other persons, placed the offending substance in a position to do harm. Olinger v. Great Atlantic & Pacific Tea Co., 21 Ill2d 469, 475–476, 173 NE2d 443 (1961).

It is difficult to find factual parallels in other cases. However, in Hocker v. O'Klock, 16 Ill2d 414, 158 NE2d 7 (1959), liability was imposed on the basis of inferences. In the action under the Liquor Control Act (Ill Rev Stats 1961, c 43, § 135) for damages due to death inflicted by an intoxicated person, the court held (pp 421–423) that it was proper to show that an intoxicated person with whom the deceased was last seen alive had a revolver of the same make as that used in the killing when arrested three weeks later, that his car had the same tire treads as the tire marks

seen where the body was found, and, by a qualified coroner's testimony, that death occurred some hours before the intoxicated person was found asleep in his car, even though the precise time could not be established.

In E. K. Wood Lumber Co. v. Andersen, 81 F2d 161 (1936), cited in Lindroth v. Walgreen Co., 407 Ill 121, 132, 94 NE2d 847 (1950), the evidence connecting defendant with the death of a fisherman consisted primarily of red paint appearing on a piece of the fisherman's wrecked boat, defendant's steamer apparently having been the only vessel in the vicinity at the time of the occurrence which had a red hull from which the smear on decedent's boat could have come. There the defendant moved the court to direct a verdict in its favor on the ground that any jury verdict would rest merely on inferences. The court rejected this contention, saying (p 166):

> ". . . . The favorite formula that a presumption may not be based on another presumption, or an inference on another inference, has often been used carelessly and inaccurately with resultant confusion.
>
> "This rule has been discussed at length in Jones on Evidence (2d Ed) § 364. There the author refers to the conflicting authorities and offers what he terms the 'true rule.' He maintains that it is consonant with enlightened common sense and that the better reasoned cases sustain the holding that a 'fact,' although arrived at by indirect or circumstantial evidence, may serve as a basis for an inference; where the evidence sustaining the first inference is of such a character and so strong that it justifies a conclusion, that is to say, that 'once the facts are established from which a presumption or inference logically flows or legally arises, whether such basic facts are established by

244

circumstantial evidence or by direct testimony, it is the province of the jury to deduce the presumption or inference.' [Citing authorities.]"

In the instant case, plaintiff has offered evidence tending to show that some of the gondolas in defendants' train had holes in their bottoms, creating a strong possibility of a cargo loss. Further, plaintiff has offered documentary evidence in the form of weighing reports which tend to indicate that an in-transit loss of cargo in fact occurred. Arrayed against this evidence that the scrap cargo found near the diamond came from defendants' train is the bare possibility that some other train may have carried a similar cargo across the diamond and dropped the scrap found there. A bare possibility of this character can neither make nor break a case. Finally, it appears that the scrap found near the diamond is the probable cause of the derailment, having been found in the immediate area of the derailing object sighted by plaintiff's fireman Convis, and nothing else having been found which was the likely cause of the derailment. This is, then, a case for the jury, since the probable cause of the derailment has been reasonably related to the defendants' operations over the diamond. Donoho v. O'Connell's, Inc., 13 Ill2d 113, 124–125, 148 NE2d 434 (1958).

■ Defendants finally contend that recovery should be denied because the testimony of plaintiff's fireman Convis indicates that he did not call out for a stop immediately upon sighting the derailing object, thinking that it was a two-by-four which would easily be cast aside by the cowcatcher of the train. They argue that the fireman's hesitation constitutes contributory negligence such as to bar recovery as a matter of law. We disagree. According to the uncontradicted testimony of this same witness Convis, only one or two

245

seconds elapsed between his first glimpse of the de-railing object and the beginning of the derailment of the train, which was then traveling at about fifty miles per hour. We doubt that at such a speed and in so short a time anything could have been done to alter the course of events.

For the reasons indicated, the judgments in favor of each of the defendants are reversed, and the cause is remanded for trial.

Judgments reversed and cause remanded with directions.

BURKE, PJ and BRYANT, J, concur.