[Crim. No. 5281.   First Dist., Div. Three.   Oct. 24, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. GARY WONG, Defendant and Appellant.

Gerard J. Glass, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Louise H. Renne, Deputy Attorneys General, for Plaintiff and Respondent.

BRAY, J.*—Appeal from judgment of conviction after jury verdict of guilty of violation of Penal Code, section 459 (burglary, second degree).

### QUESTIONS PRESENTED

Admissibility of testimony concerning condition of the pay telephone approximately six hours after defendant's arrest, and of the paper used to stuff the telephone, found at that time:

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

FACTS

Defendant was charged by information with violating section 459, by entering a certain telephone booth with intent to commit theft.[1]

On March 12, 1965, at about 2 a.m., police officer Alexander Barron saw defendant occupying one of two pay telephone booths in the 700 block of Market Street, San Francisco. He watched defendant for from 30 seconds to a minute "working a metal tine up and down inside the coin return chute." After informing defendant of his rights, Barron asked him what he was doing there. He replied that he was "just checking the box." Barron placed him under arrest and found $2.10, all in dimes, on defendant's person. He also found 40 cents in dimes in the coin return chute. Barron left the area with defendant without placing any guard at the booth or any notice on it that the telephone should not be used.

Telephone company's senior security agent, Sorenson, testified that at approximately 8 o'clock the same morning, he examined the booth to see if the phone had been "stuffed." "Stuffing" consists of inserting paper or some other material inside the coin return throat or "hopper" so that the coins "back up" and can be removed. On testing the phone by placing a penny in it, which if there is no mechanical malfunction or stuffing, should fall through, and finding that the penny did not fall through, he removed the upper housing of the phone. He then found that paper was very tightly stuffed inside the coin return throat. Removing the paper, he found $7.43 in coins which had backed up. Of the coins found, 13 were pennies. Sorenson testified that several pennies are commonly found where a phone has been stuffed, since they are used for testing, as in most cases the stuffer will return several times to learn if the coin box is still stuffed. When the stuffer decides to remove the coins from the phone he "jiggles the coins out" by means of a wire tine similar to the one defendant used, or some other spring steel object. The tine is inserted and the paper is jiggled. Since the coins are heavier than the paper, by a constant shaking motion or jiggling, gravity will cause the coins to drop down and through the stuffing material. With this method, it is possible to "milk" the coins out.

Sorenson testified that this telephone averaged $4.20 daily

---

[1] No contention is made that a telephoone booth is not a "building" within the meaning of section 459. (*People* v. *Miller* (1950) 95 Cal. App.2d 631, 634 [213 P.2d 534] so held.)

during the past 12 months. He could not say whether any money had been placed in the phone subsequent to defendant's arrest. He also testified that on an occasion he had seen defendant, in the custody of police officers, point out three phone boxes that were stuffed and defendant showed how he had stuffed them. Sorenson also testified that it was his experience that a metal tine is never left in a phone box by the stuffer. He also said that just two days before, he had seen defendant go into a phone booth on Fourth Street, one-half block from Market Street, insert a coin in the phone box and walk out with no attempt being made to make a call. (Defendant denied ever entering a phone booth in that area before the morning in question.)

Policeman Kerrigan of the narcotics squad testified that in May 1964 he saw defendant stuffing a phone box (not the affair for which defendant was being tried). An instruction limited this testimony solely to proof of defendant's intent.

Although Barron testified that defendant had no difficulty conversing with him in English, he insisted upon testifying through an interpreter. He said that on the evening of March 11, he had three one-dollar bills and miscellaneous change. At an all-night amusement center on Market Street, he changed the $3 into dimes. He then played 9 games of pinball which cost him 90 cents. He bought a newspaper and went back to his room. Becoming hungry, he decided to get a hot dog. He then went down to Market Street to get it. When asked why he didn't get one at the hot dog places near his room, he replied "Wherever I want to buy, why, I could go there, couldn't I?" After buying the hot dog, "I had no intention of going anywhere except that I was just strolling along while eating my hot dog." After eating, he thought of calling his friend in Oakland (this was around 2 a.m.). The friend's last name is Louie. He didn't know the friend's home address or phone number. He intended to ask the operator for the number of a club that "he hangs around in." He didn't know whether the club would be open at that hour. When asked if he expected his friend to be there at 2:30 in the morning, he replied that he couldn't guarantee that he would be there.

In the phone booth, he put a dime in the box but it didn't fall through. He thought the phone was out of order. He opened the coin return box to get his dime back. He then noticed a metal strip protruding from the coin box. Just then the policeman came. He told the officer "I place a dime in the coin slot and I didn't get the call through and I just wanted

my own dime back.'' He did not tell the officer that he was checking the box.

On cross-examination, defendant said he didn't see the metal strip and he wasn't sure whether he touched it.

### Admissibility

Sorenson's testimony concerning his examination of the phone box was admitted over defendant's objection. Likewise, over objection, the paper he found in the box was admitted.

Defendant contends that admission of both was prejudicial error because there was no direct evidence that the box was in the same condition when the officer left the booth around 2:25 a.m. as it was when examined by Sorenson at 8 a.m.[2]

■ It is true that ''Before the admission of evidence of a prior or subsequent condition, it must be shown that there has been no substantial change in the interim, or that the condition was substantially the same at the time of the accident or other event sought to be shown'' (18 Cal.Jur.2d, § 147, p. 598). ■ It is also true as there stated that ''a condition shown to exist at a given time is not *presumed* to have existed at a previous time, without proof that there was no change during the interval.'' (Italics added.) However, although there may be no presumption on the subject, there may be inferences which may be drawn which will provide the proof needed.

This subject has been well treated in *Slovick* v. *James I. Barnes Constr. Co.* (1956) 142 Cal.App.2d 618, 624, 625 [298 P.2d 923], where the court said: ''True, it is commonly held that a presumption of continuity of a given condition does not run backward (18 Cal.Jur.2d, § 85, p. 514.) Professor Wigmore says, in the footnote on page 413 of 2 Wigmore on Evidence, Third Edition: 'This fallacy that ''presumptions do not run backward'' occurs again in *Krantz* v. *Krantz* (1933) 211 Wis. 249 [248 N.W. 155]. It would be interesting to trace out the origin of that fallacy.' In the text of section 437 on pages 413-414 he says: 'Similar considerations affect the use of *subsequent existence* as evidence of existence at the time in issue. Here the disturbing contingency is that some circumstance operating in the interval may have been the source of the subsequent existence, and the propriety of the inference will

---

[2]Defendant's brief states that Sorenson's testimony was admitted ''under an exception to the traditional rule barring admission of hearsay.'' Defendant does not amplify this statement. Obviously, Sorenson was testifying to his own observations and expertise. This is not hearsay.

depend on the likelihood of such intervening circumstances having occurred and been the true origin. On landing at New York it can hardly be inferred that the steamer at the next dock has been there for a week; but it may usually be inferred that the dock has been there for some years; while the particular circumstances of appearance and the like will in the latter instance affect the length of time to which the inference could be carried back. Here, as with prior indications, the *interval of time* to which any inference will be allowable must depend upon the nature of the thing and the circumstances of the particular case. . . .

'This general principle that a *prior* or *subsequent* existence is evidential of a later or earlier one has been repeatedly laid down, and has even been spoken of as a Presumption (*post*, § 2530).'

"Volume 31, Corpus Juris Secundum, section 140, page 790: 'Accordingly, in some circumstances, an inference as to the past existence of a condition or state of facts may be proper, as, for example, where the present condition or state of facts is one that would not ordinarily exist unless it had also existed at the time as to which the presumption is invoked. An inference that a state of affairs existed at a certain time may be reinforced by evidence that it continued to exist at a subsequent time.' In effect such was the ruling in *Swarzwald* v. *Cooley*, 39 Cal.App.2d 306, 316 [103 P.2d 580], and *Crinella* v. *Northwestern Pac. R. R. Co.*, 85 Cal.App. 440, 448 [259 P. 774]. [Citations.] Actually it is an inference rather than a presumption with which we deal, . . ."

See 31-A, C.J.S., § 140, p. 305 et seq. for cases holding that in some circumstances inference from present conditions as to the past existence of a condition or state of facts may be proper.

In *Grand Trunk Western R. R. Co.* v. *M. S. Kaplan Co.* (1963) 43 Ill.App.2d 230 [193 N.E.2d 456, 7 A.L.R.3d 1289], the reviewing court reversed the judgment because the trial court, on the ground that "presumptions do not relate backward," refused admission of evidence of the condition of the gondolas involved in the accident some two or three weeks after the accident, stating: "Whether evidence of a condition properly 'relates backward' depends upon the character of the condition itself, whether permanent or transitory; upon the apparent likelihood of intervening alteration, through natural forces or human interference; and finally upon the length of

time which the inference of unchanged condition must span." (7 A.L.R.3d, p. 1297.)

In an annotation to that case, pp. 1305, 1306, the writer states: "Although in logic it would seem that the operation of this principle would be independent of chronological viewpoint, that is, that the probability of continuity would extend in both chronological directions from the point of observation, some courts early refused to give the 'presumption' retrospective operation saying that it did not 'run backward,' and this restriction has had surprising persistency and currency, despite its logical weakness.

"The rule that the inference of continued existence of the physical condition of property cannot be drawn to support a finding of past existence has, however, been rejected by a good many courts, and probably by most of those which have given the matter any very extensive examination.

"Assuming that the showing of existence at one point in time has logical relevancy to support a conclusion of existence in the past, it seems clear that the logical force of the conclusion will vary depending upon (1) the static or ephemeral nature of the condition at issue, and (2) the time interval involved. . . .

"Since the matter does turn to a great degree upon the particular factual situation presented and the time intervals involved, many courts have taken the view that the admissibility of evidence of a subsequent condition, offered to demonstrate existence of the same condition in the past, is largely a matter for the discretion of the trial judge."

In *Blank* v. *Coffin* (1942) 20 Cal.2d 457, 463 [126 P.2d 868] the court stated: "Evidence of the existence of a particular condition, relationship or status . . . is admissible to indicate the existence of the same status, condition or relationship at the time of the act."

■ The circumstances of the case at bench demonstrate no reasonable probability that the phone box was stuffed during the approximate six-hour interval when it was not under observation. Or, put another way, a reasonable inference to be drawn from the facts is that the box was stuffed before and at the time of defendant's arrest. Actually, an inference of the kind we are considering need not necessarily prove the inferred fact beyond a reasonable doubt. ■ It is well settled that "The law does not require that each fact in a chain of circumstances be proved beyond a reasonable doubt. The doctrine of reasonable doubt applies to proof of guilt and not to

the proving of each event asserted to be a link in the inculpating chain of incidents [citations]." (*People* v. *Eddy* (1954) 123 Cal.App.2d 826, 835 [268 P.2d 47].)

The circumstances are:

(1) Defendant was caught in the act of using a metal tine to release the moneys in the box, the instrument commonly used by "stuffers."

(2) defendant had $2.10 in dimes in his possession,

(3) there was 40 cents in the coin return chute when defendant was arrested, indicating that he had caused that amount to drop down,

(4) for a year, the phone booth had averaged only $4.20 a day, yet there was $7.43 backed up behind the stuffing, indicating that the stuffing had been there longer than the 6 hours after defendant's arrest,

(5) defendant's statement to one officer that he was "checking" the box,

(6) defendant's testimony that when he tried to get his dime back, he could not, thereby indicating that the phone was then stuffed,

(7) defendant's testimony was contradictory and implausible.

Defendant relies principally upon *People* v. *Mahach* (1924) 65 Cal.App. 359 [224 P. 130], where it was held that the trial court properly excluded testimony to the effect that there was an open, well-marked trail to the spot where defendant three months before had left a suitcase lost from the robbery. The purpose of the testimony was to show that in placing the suitcase in the bushes, defendant was not hiding it. The court held that it was not shown or attempted to be shown that conditions at the place and surroundings where the suitcase was found were the same three months later as they were when the suitcase was left. The case is not in point here where there is evidence of some of the conditions at the time of defendant's arrest which, coupled with conditions six hours later, lead to the reasonable inference that conditions were the same at both times.

The fact that the booth was left unlocked and unguarded for six hours and that the booth stood on a major street in San Francisco were matters going to the weight of the evidence and not to admissibility.

The court did not err in admitting both Sorenson's testimony and the paper which he found stuffed in the phone box.

Moreover, assuming that defendant was not the one who stuffed the phone box, the fact that he was shoving a metal tine up and down in the coin return chute would justify a finding that he entered the phone booth for the purpose of manipulating coins out of the phone box. This act made him guilty of the crime charged.

Judgment affirmed.

Draper, P. J., and Devine, J., concurred.