GEORGE SHELTON, JR., Plaintiff-Appellant, *v.* SUNNIDAY CHEVROLET *et al.*, Defendants-Appellees.

First District (4th Division)    No. 80-664

Opinion filed June 11, 1981.

Walter M. Ketchum, Ltd., of Chicago (John C. Griffin, of counsel), for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, J. Patrick Herald, Daniel J. Cheely, and John A. Detzner, of counsel), for appellee General Motors Corporation.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith and Manuel D. Sanchez, of counsel), for appellee Sunniday Chevrolet.

Mr. JUSTICE LINN delivered the opinion of the court:

Plaintiff, George Shelton, Jr., was injured when his new Chevrolet van ran over his leg. He had purchased the van from defendant Sunniday Chevrolet. The van was manufactured by defendant General Motors. Plaintiff brought this action in the circuit court of Cook County seeking damages for his injuries based on three theories: breach of warranty, strict liability, and negligence. The case went to trial and instructions were given to the jury encompassing the breach of warranty and strict liability claims. The trial court refused to give instructions on negligence. The jury returned a verdict in favor of defendants and the trial court entered judgment on this verdict.

On appeal, plaintiff contends: (1) the trial court erred in disallowing plaintiff to present evidence that the van had a defect in the gear linkage five years after the accident; (2) the trial court erred in refusing to give

instructions on negligence; and (3) the trial court erred in excluding certain evidence on the issue of damages.

We affirm.

*Background*

In 1974, plaintiff was the owner and operator of a coffee and donut delivery service. To perform this service, plaintiff used a van stocked with his merchandise. He would drive to several locations every day and sell his goods to employees at those locations. One of his regular stops was at defendant Sunniday Chevrolet.

On April 11, 1974, plaintiff purchased a new Chevrolet van from Sunniday. The van had an automatic transmission with the gearshift on the steering column. Before the van was sold to plaintiff, it was inspected by Sunniday and given a test drive to assure it operated properly and contained no defects. Sunniday discovered nothing wrong with the van except for a few minor problems which were corrected and are not involved in this case.

The plaintiff used the van in his business for the next two weeks after purchase. He testified that the van worked properly during this time except that the gearshift lever was stiff and more difficult than normal to shift and that the van idled a little too high. During this two-week interval, plaintiff did not complain to Sunniday about these problems because he assumed they existed merely because the van was new.

When plaintiff began his morning rounds on April 25, 1974, he discovered that the van was idling at an even higher rate than before. When he arrived at Sunniday to make his daily delivery of coffee and donuts, he told the service manager, whom he knew well, about the high idle. The service manager told him Sunniday could fix the problem but plaintiff would have to wait a few minutes for a mechanic. Plaintiff told the service manager he could not wait but that he would bring the van back in the afternoon. The service manager agreed to this.

Plaintiff continued on his rounds and eventually arrived at a Texaco station, one of his regular stops. He drove into the station and stopped the van on a slight incline and pushed the gearshift lever as "far as he could" to the left. He did not look to see if the indicator needle actually showed that the van was in park. He did not engage the emergency brake and left the engine running while he went inside the station to take orders for coffee and donuts.

Plaintiff was inside the station for approximately four minutes. When he returned to the van, he went to the side door to open it so he could get the coffee and donuts that had been ordered. He had to pull hard on the side door to get it to open. Upon doing so, he heard or felt a "clunk." The van started to move in reverse. He held on to the door and tried to get inside the van while it was moving. He failed to get inside, fell to the

ground, and the van ran over his leg. The van continued on, traveled approximately 140 feet, ran up a 12- to 14-inch curb across the street, slammed into a utility pole, and sustained substantial damage to its rear body.

The above facts are undisputed. The basic dispute at trial was whether the gear linkage system or any other parts of the transmission or gearshift contained an ureasonably dangerous defect that caused the accident. The evidence presented on this issue was as follows.

Immediately after the incident, a police officer arrived on the scene (as did an ambulance in which plaintiff was taken to the hospital). The police officer testified at trial by way of an evidence deposition. He said that when he found the van against the utility pole, the engine was still running. The idle was very high and the van appeared to be jumping up and down in the rear, apparently because it was still running in reverse. The officer got into the van and noticed that the gearshift indicator needle was located between park and reverse. He pushed the gearshift into park. To do so, he had to slam the gearshift into position because it was difficult to move. However, once the indicator needle showed the van was in park, the van stayed in park.

Plaintiff was treated at the hospital and released the same day. A few days later, his leg began to swell and he eventually spent 11 days in the hospital. As a result of the accident, he still walks with a limp today.

The day after the accident plaintiff drove the van to Sunniday and told the service manager about the accident. He apparently told the service manager that he had parked the van and that it had somehow shifted into reverse and caused the accident. The service manager testified that several Sunniday employees and he tested the van to determine what might have caused the accident. With the engine running, the service manager put the gearshift in park and tried accelerating the engine while the other employees rocked the van back and forth to see if the van would jump out of park and into reverse. The van stayed in park. The service manager did not have any trouble shifting the gears. That day, a Sunniday employee fixed the idle on the van. Sunniday also eventually repaired the body damage to the van. At the time of trial, plaintiff still owned the van.

Plaintiff testified on his own behalf. He was permitted to testify to a condition of the van he noticed on a regular basis from the time of the accident until six months after the accident. He testified that the gearshift was always stiff and difficult to shift and, on a daily basis, he noticed that he could put the gearshift into park while the engine was running, slam the driver's door or bang on the steering column, and the gearshift would jump out of park into reverse and the van would move in reverse. He never told Sunniday about this condition, except for his reference to it on the day after the accident when Sunniday found nothing wrong with the

gear mechanism, and he never attempted to have the condition repaired.

Plaintiff called an expert witness who inspected the van three years after the 1974 accident. He conducted several tests to determine if there was a defect in the gear linkage system. He had no trouble shifting gears. He said when the gearshift was put in the park position, the van would stay in park even when one slammed the doors or struck the steering column. However, he said that he could purposely move the gearshift lever to a position where the needle indicated between park and reverse. The van would be in hydraulic neutral and would not move on a slight incline, but if he slammed a door or struck the steering column the gearshift indicator needle would jump into reverse and the van would move in reverse.

Plaintiff's expert concluded that the above condition must have caused the accident. He said the gear linkage system had been designed in this manner. He said the condition was unreasonably dangerous and that defendant General Motors could have used a different design that prevented this condition. He also said that General Motors had designed other kinds of vans before 1974 which did not have this condition.

An engineer for defendants who inspected the van a year and a half after the 1974 accident testified during plaintiff's case-in-chief under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). His inspection and tests showed nothing wrong with the gear linkage system or the gearshift.

Defendants presented an expert witness to rebut plaintiff's evidence of defective design. This expert had not inspected the van but was knowledgeable of the design of the van. He said the design of the gear linkage system and gearshift was similar to other designs used by General Motors on vans manufactured in 1974 and before 1974. He said that if one shifted the van into park it would stay in park. He admitted that the van gears could be intentionally placed in between park and reverse. He said one could do this with almost any automatic transmission. The gear linkage was designed so that if the van was shifted from reverse to park, the gears would first disengage from reverse to hydraulic neutral before going into park. This was done to prevent the gears from shifting directly from reverse to park. However, if one truly shifted the gearshift "as far as one could" to the left, as testified to by plaintiff, the van would be in park. It was his opinion that plaintiff had left the van in reverse.

OPINION

I

*Excluded Evidence*

Plaintiff was allowed to testify at trial that during the six month period following the 1974 accident he regularly would put the van in park, slam a door or bang on the steering column, and the van would jump into

reverse. Plaintiff was not allowed to testify to noticing the same condition on a regular basis for a period beginning six months after the accident and lasting until 1979, five years after the accident.

The trial court imposed this six-month limitation pursuant to a motion in limine filed by defendants which had sought to exclude all of plaintiff's testimony as to the allegedly defective condition he noticed in the van after the accident.

The trial court said that its limitation was arbitrary but that the limitation was being imposed as an accommodation between the conflicting views of the parties. Plaintiff, of course, had to prove that any defect allegedly existing in the gear mechanism existed at the time the van left the manufacturer's or seller's control. (*E.g., Freeman v. White Way Sign & Maintenance Co.* (1980), 82 Ill. App. 3d 884, 403 N.E.2d 495.) Defendants moved to exclude all of plaintiff's testimony as to the alleged condition of the van noticed by plaintiff after the accident because, according to defendants, there was no foundation that the condition noticed by plaintiff existed before the 1974 accident or before plaintiff took possession of the van. The trial court, however, concluded that, since the accident occurred only two weeks after the van was sold and since the accident did not appear to have affected the gear mechanism, a reasonable inference arose that the condition allegedly noticed by plaintiff immediately after the accident existed when the van was manufactured.

Nevertheless, the trial court refused to allow plaintiff to testify to noticing the same condition for a period beginning six months after the accident and continuing until 1979. The court reasoned that, beyond six months after the accident, other factors, such as wear and tear on the gear linkage system from constant use, could have caused the alleged condition noticed by plaintiff and the relevancy of plaintiff's testimony would have been slight. The trial court also reasoned that plaintiff's testimony relating to the alleged condition during the first six months after the accident would be sufficient for plaintiff to establish what he wanted to establish and any testimony relating to the alleged condition beyond the first six months after the accident would be cumulative.

■■ As one point of error, plaintiff specifically challenges the trial court's six-month limitation because it was admitted to be arbitrary; however, we believe the trial court did not abuse its discretion in setting the limitation based on its reasoning that plaintiff's testimony relating to the alleged condition beyond the six months after the accident would have been cumulative. Nevertheless, as a second point of error, plaintiff challenges the exclusion of his testimony because plaintiff wanted to present it as a foundation for other evidence which was also excluded and which plaintiff alleges should have been admitted.

In 1979, five years after the accident, plaintiff took the van to

Sunniday and told a Sunniday employee about the gearshift condition he noticed in the van. Except for plaintiff's reference to this condition the day after the accident, plaintiff had never complained to Sunniday about the alleged condition during the entire five-year period after the accident. Also, plaintiff had never attempted to have anyone else repair the alleged condition.

The trial court refused to allow the Sunniday employee to testify to what he had found when plaintiff brought the van to Sunniday in 1979. If allowed to testify, the Sunniday employee would have said that he had inspected the van in 1979 and found that, when the gearshift was placed all the way into park, a slam of the driver's door or a bang on the steering column caused the gearshift to jump into reverse and the van to move in reverse. The Sunniday employee would also have said that he did not know whether the condition had existed in 1974, but that he had noticed corrosion in the gear linkage which could have caused the condition. Additionally, the employee would have testified that he had repaired the condition by cleaning the gear linkage system and adjusting the gears.

As a basis for refusing to allow the testimony of the Sunniday employee (and the testimony of another employee verifying the first employee's testimony) the trial court asserted that wear and tear on the gear linkage system during the five years of constant use (the van had 85,000 miles on it at the time) was the likely cause of the condition discovered by the employee and plaintiff's testimony that he had noticed the condition on a regular basis throughout the five-year period was an insufficient foundation to show that the condition discovered by the employee was relevant to the issue of the condition of the van when it left the manufacturer's control.

■■ We believe it was error for the trial court to omit the Sunniday employee's testimony, and plaintiff's foundational testimony as to the condition of the van during the five-year period following the 1974 accident, but we hold the error was harmless.

The relevancy of the Sunniday employee's testimony depended on whether a reasonable inference could have arisen that the condition discovered by the employee existed at the time the van left the manufacturer's control. (See *Mareci v. General Motors* (1980), 90 Ill. App. 3d 335, 413 N.E.2d 34; *Gass v. Carducci* (1962), 37 Ill. App.2d 181, 185 N.E.2d 285.) When there is a lack of direct foundational testimony to establish that a subsequently discovered condition may have existed at the time a product left the manufacturer's control, the relevancy of evidence concerning the subsequently discovered condition usually depends on an analysis of three factors: (1) the character of the condition, whether it is permanent or transitory; (2) the apparent likelihood of intervening alteration, through natural forces or human interference; and (3) the

length of time in which the inference of unchanged condition must span. (*Mareci v. General Motors* (1980), 90 Ill. App. 3d 335, 413 N.E.2d 34; *Grand Trunk Western R.R. Co. v. M.S. Kaplan Co.* (1963), 43 Ill. App. 2d 230, 193 N.E.2d 456.) However, when there is direct foundational evidence which establishes with a reasonable degree of certainty that the subsequently discovered condition existed at the time the product left the manufacturer's control, the above factors are not controlling. See *Jines v. Greyhound Corp.* (1965), 33 Ill. 2d 83, 210 N.E.2d 562; *Mareci v. General Motors* (1980), 90 Ill. App. 3d 335, 413 N.E.2d 34; *La Salle National Bank v. Feldman* (1966), 78 Ill. App. 2d 363, 223 N.E.2d 180; *Grand Trunk Western R.R. Co. v. M.S. Kaplan Co.* (1963), 43 Ill. App. 2d 230, 193 N.E.2d 456; *Gass v. Carducci* (1962), 37 Ill. App. 2d 181, 185 N.E.2d 285.

In the present case, the only period of time for which there was no direct foundational evidence to establish that the condition found by the Sunniday employee existed at the time the product left the manufacturer's control was between the time the product left the manufacturer's control and when plaintiff first discovered the alleged condition, which was approximately two weeks after the van was sold. There is no argument that plaintiff's testimony as to the condition he noticed on a regular basis shortly after the accident was relevant and admissible. After that, plaintiff's testimony that the condition continued during the five-year period established the necessary foundation and the relevancy of the Sunniday employee's testimony as to the condition the employee found. Whether plaintiff was to be believed and whether the condition was more likely to have been caused by wear and tear from constant use were factors that went to the weight of the evidence and not its relevancy or admissibility.

Though it was error to omit the evidence, we believe the error did not result in any manifest prejudice to plaintiff. The condition about which plaintiff testified and the condition discovered by the Sunniday employee was that the gearshift could be placed all the way into park, and if the van was jarred the transmission would shift into reverse. This was not the condition found in the van by plaintiff's expert who testified that the gearshift and gear linkage could be purposely placed between park and reverse and if the van was jarred it would jump into reverse. The condition about which plaintiff testified was not one of design and was easily corrected by an adjustment to the gear linkage.

All of the evidence presented, besides plaintiff's testimony, contradicted a conclusion that the alleged condition actually existed in the van before 1979. Even plaintiff's own expert testified that when he inspected the van it would not jump into reverse when placed all the way into park. Plaintiff never had the alleged condition repaired, and, except for his reference to the condition the day after the accident, plaintiff never told

anyone that the alleged condition existed until long after the accident. The proposed testimony of the Sunniday employee supported more the conclusion that the condition was due to wear and tear on the van than the conclusion that the discovered condition existed at the time the van left the manufacturer's control.

■■ Thus, we believe the proposed testimony of the Sunniday employee would have been of limited probative value, and the outcome of the trial would probably have been the same, and we conclude the error was harmless.

## II

*Negligence Instructions*

The trial court refused to instruct the jury on the issue of negligence, finding that there was no evidence to support a theory that either defendant had been negligent. In his complaint, plaintiff had alleged that defendants were negligent in committing the following acts or omissions to act:

"a. Failed to inspect said vehicle before delivery so as to be sure that said vehicle was reasonably fit for the use for which it was intended.

b. Failed to correct said vehicle's idle when the same was known to the defendants to be dangerous and defective.

c. Failed to correct the linkage and/or the linkage system so that the same operated properly when they knew of said condition or could have reasonably known of the same."

Plaintiff alleges the trial court committed reversible error by refusing to instruct the jury on negligence.

■■ To justify the giving of an instruction, there must be some evidence in the record to support the theory set out in the instruction. (*Figarelli v. Ihde* (1976), 39 Ill. App. 3d 1023, 351 N.E.2d 624.) In the present case, there was no evidence to show that defendants had failed to inspect the van before delivery, and the evidence presented conclusively showed that it was inspected. As to the alleged negligent failure to correct the van's idle, defendant Sunniday offered to repair it when plaintiff brought the van in on the morning of the accident but plaintiff chose not to have it repaired at that time. Defendant can hardly be charged with negligence because of plaintiff's choice not to have the idle repaired, and there was no evidence to support a conclusion that Sunniday should have known of the alleged unreasonably high idle before plaintiff informed Sunniday of the fact.

■■ As to plaintiff's third allegation, the negligent failure to correct the gear linkage, even assuming there was evidence to support such an allegation, the jury's finding against plaintiff on the strict liability and

breach of warranty counts cured any possible error that may have occurred. Any negligent failure to correct an unreasonably dangerous condition in the gear linkage presupposes that a dangerous condition in the gear linkage causing the accident existed. By its finding against plaintiff on the strict liability and breach of warranty counts, the jury negated any inference that an unreasonably dangerous condition in the gear linkage causing the accident existed.

Consequently, we hold that plaintiff's contention is without merit. We also find we need not address the issue raised by plaintiff concerning the exclusion of evidence concerning damages since our disposition of the other issues in this case shows that defendants are not liable for damages.

Accordingly, for the reasons noted, we affirm the judgment entered for defendants.

Affirmed.

ROMITI, P. J., and JOHNSON, J., concur.