Robert D. Marian and Phyllis J. Marian, Plaintiffs-Appellees, v. Lena Pellet Company, an Illinois Corporation, Defendant-Appellant.

Gen. No. 69–113.

Second District.

February 25, 1970.

Holtan and Garrity, of Freeport, for appellant.

Knight, Ingrassia and Schirger, of Rockford, for appellees.

MR. JUSTICE THOMAS J. MORAN delivered the opinion of the court.

This action was brought by a dairy farmer for the death of one cow and damage to his dairy herd, allegedly caused by the presence of arsenic in feed pellets provided by the defendant feed company. The defendant appeals from a jury verdict against it.

Defendant complains that the trial court erred in failing to grant its motion for a directed verdict at the close of the plaintiffs' case; at the close of all of the evidence; and for failing to enter judgment notwithstanding the verdict or grant a new trial as requested in its post-trial motion. Complaint is also made that the court erred in instructing the jury on circumstantial evidence.

The plaintiffs are dairy farmers in Orangeville, Illinois. Robert Marian is a well-trained and qualified dairy farmer. In 1966 he had about forty head of dairy cows, 37 or 38 of which were registered. In September of 1966 he changed the feed of his herd which was provided in bulk by the defendant. From September 17, 1966, to February, 1967, the entire grain ration of the herd was Lena Pellets. Approximately two tons of pellets were delivered every four days. During this period the cows were also fed the plaintiffs' own hay and silage.

On December 8, 1966, he observed his first sick cow; thereafter, there were sixteen other cows that had become sick. On that date he called a local veterinary clinic and Dr. Klecker, who regularly serviced the herd, came and examined the sick cow. It seemed that the sickness attacked the cows which were eating the most grain. The affected would go off their feed as soon as they freshened; they ran no temperature but some developed diarrhea. Other veterinarians looked at them, but none could determine the condition from which they suffered. Efforts by the veterinarians did not seem to help, and milk production fell off.

On February 17, 1967, the cow in question calved in the morning; that evening she went off her feed. The following morning she was found dead in the barn and there was no evidence that the cow died from calving. Her carcass, along with a sample of the feed pellets, were taken to the USDA laboratory in Madison, Wisconsin, where both were examined and reported upon.

Veterinarian Klecker testified that he was familiar with the plaintiffs' farm and herd for almost ten years and that he serviced the herd in question between two and three times each month in an average year; that in December of 1966 he was called and found that the cows were off their feed and down on milk production, but had no fever; that he recommended the plaintiffs analyze the hay and silage or check the water for something toxic; that he suspected something toxic was affecting the herd; that the cows were checked by three veterinarians, however, they were unable to arrive at any type of medical opinion prior to February, 1967.

The doctor further testified that arsenic is not a part of dairy feed and is a severe poison to dairy cattle; that there are organic and inorganic sources of arsenic; that the effect of arsenic differs on various animals; that a certain level of organic arsenic may not kill one animal while only one-fourth of that same amount may be fatal to another; that four parts per million of arsenic in the liver of a cow might possibly be enough to kill a cow, depending on the form of the arsenic; that it is difficult to diagnose the effects of toxic arsenic on cows because the symptoms are obscure; you may get a poor hair coat, loss of appetite, emaciation, production affected; that there should be no arsenic in feed for dairy cows; that there is absolutely no tolerance for arsenic in dairy feed and that he suspected the feed at the time.

Upon cross-examination the witness testified that he had made no special study of the effects of arsensic but

that poisons had been studied in the course of his schooling; that he had seen poisoning cases involving other animals but had not seen it in the case of a cow before this; that inorganic arsenic is much more toxic than organic arsenic, but the report concerning the finding of the dead cow in question did not indicate whether the arsenic found in its liver was organic or inorganic; that he had recently read some professional article on arsenic poisoning; that if there was 0.3 parts per million of arsenic found in the liver of a cow the witness did not know for sure whether this would be toxic, but there is a wide variation in the different compounds; and that arsenic is accumulated in an animal but if the animal is separated from the source, in time it passes off.

The defendant produced Dr. Eveleth, a toxicologist with the Department of Agriculture for the State of Wisconsin. This witness testified that he had a long experience with toxicology and has devoted much of his time to the study of the effect of poisons; that he has been an expert in arsenic poisoning for over twenty years; that the first sign of arsenic poisoning in a dairy cow is a decrease in milk production and a lack of appetite; that within twenty-four hours or so the animal has loose diarrhea and there may be blood involved; that if a lethal dose is involved, the fourth stomach of the cow would be fiery red and the intestines the same way; that the intestinal contents will be high in arsenic and if the animal has lived long enough the liver and kidneys will contain considerable arsenic; that the animal will be depressed and give very little milk; and that she may drink considerable water, but the next thing is diarrhea and that either clears up, or the cow dies.

The witness referred to and read a report from the laboratory concerning the dead cow. The report was admitted without objection, relied upon by the parties and provided:

135

"The feed sample was negative for lead and showed .4 parts per million of arsenic. The cow showed a fibrinous pleuritis on necropsy with blood in the pleural cavity. The liver showed 4 P.P.M. of lead and the bowel content was negative. The liver showed .3 P.P.M. of arsenic and the bowel content 4.0 P.P.M. Over 5 P.P.M. of lead in the liver and kidney are considered toxic. Over 2 P.P.M. or arsenic in tissues are considered toxic."

The witness was of the opinion that the fibrinous pleuritis with blood in the pleural cavity was not symptomatic of arsenic poisoning but symptomatic of shipping fever, or virus diseases with organism pasturella; that an animal would have to eat 30 to 31 thousand pounds of feed to kill it, if the feed contained 4 parts per million of arsenic; that in his opinion the presence of the fibrinous pleuritis would mean that the cow had been ill for some time; that if the animal had 4.0 parts per million of arsenic in the bowel content, she would still have to eat 3,000 pounds of the feed to get a toxic dose; that if it was found that the animal had 0.4 parts per million arsenic in the bowel content she would have had to eat 30,000 pounds; and that he did not consider toxic, $3/10$ ths of one part per million of arsenic in the tissues of the liver. In his opinion, arsenic did not play a part in the death of the cow.

Upon cross-examination the witness testified that it is possible that one cow might be able to stand 8 parts per million of arsenic and another might not be able to withstand 4 parts per million of arsenic; that if a cow is slowly being poisoned by gradual accumulations of arsenic, the animal would not suddenly become ill; and that the United States Department of Agriculture does not recommend giving arsenic in dairy supplements.

136

Upon the close of the evidence, the plaintiff tendered IPI Instruction No. 1.03 concerning circumstantial evidence.

The jury returned a verdict of $10,000 in favor of the plaintiffs.

■ We have set forth in some detail the evidence introduced in the case and are unable to say that all of the evidence, when viewed in the aspect most favorable to the plaintiffs, so overwhelmingly favored the defendant in this case that no contrary verdict based on that evidence could ever stand. Pedrick v. Peoria & Eastern R. Co., 37 Ill2d 494, 510, 229 NE2d 504 (1967). The court properly denied the motions.

Defendant complained that IPI 1.03 concerning circumstantial evidence was given in error because no (relevant) circumstantial evidence was produced. We cannot agree with such premise. The defense doctor testified that in his opinion, the content of arsenic in the dead cow's liver and tissues, as well as the feed, could not have caused the death of the cow. The treating veterinarian testified that in his opinion the cows were suffering from poisoning and any arsenic in their feed would adversely affect them, but that the precise amount that would be lethal varied from animal to animal. Both witnesses agreed that arsenic poisoning would cause cows to go off their feed, become weak, and result in diarrhea. The owner and treating veterinarian testified to the presence of these symptoms.

■ From these facts the jury could have reasonably inferred that the herd and the dead cow suffered from arsenic poisoning, or, that the arsenic did not have an effect upon the herd. It is for the jury to determine which inference it will draw from circumstantial evidence. Sherman v. City of Springfield, 111 Ill App2d 391, 405, 250 NE2d 537 (1969); American Nat. Bank & Trust Co. v. People's Gas Light & Coke Co., 42 Ill App2d 163, 173, 191 NE2d 628 (1963).

The testimony is conflicting and the factual issue of causal connection close. It is not the function of this Court or judges to substitute their judgment for that of the jury. The determination of the credibility of the witnesses and the facts of the case are solely the function of the jury. This is particularly true in cases such as this where the issues are close. Tuskey v. Callos, 112 Ill App2d 213, 218, 250 NE2d 524 (1969); Gary v. Rogers, 104 Ill App2d 154, 158, 243 NE2d 665 (1968).

The jury was presented with the testimony of the treating veterinarian which was attacked by the testimony of an expert who had not treated or examined the herd, the dead cow or the feed. His testimony is based upon the laboratory report and his own expertise. It is the jury's obligation and right to choose between the version which it felt was most credible and persuasive. This court will not disturb the finding of the jury.

Defendant directs our attention to the case of Bradley v. Consolidated Silver Mountain Mines, Inc., 162 Wash 198, 298, 324, 298 P 324 as authority for the proposition that the treating veterinarian was not properly qualified as an expert on arsenic poisoning and therefore, he should not have been allowed to testify with regard to the effects of arsenic poisoning on cows. We do not find that the case cited holds such a rule, nor do we find that it has application to the case at bar. No objection was made to the testimony of witness Klecker's testimony regarding his findings and the condition of the herd. Furthermore, it must be remembered that this case is an action for damages to the herd and the property damage suffered by the plaintiffs by reason of the loss of production. The firsthand knowledge of veterinarian Klecker would certainly be admissible with regard to the condition of the herd. The testimony of both of the veterinarians agreed as to the effects of

138

arsenic poisoning. There is no dispute that it was present in the feed pellets. The witnesses' opinion of the effect of arsenic poisoning was admissible and the weight to be given the opinion was for the jury.

Judgment affirmed.

ABRAHAMSON and SEIDENFELD, JJ., concur.