KROCH'S & BRENTANO'S, INC. *et al.*, Plaintiffs, *v.* BARBER-COLMAN COMPANY *et al.*, Defendants—(KROCH'S & BRENTANO'S, INC. *et al.*, Plaintiffs-Appellants, *v.* BARBER-COLMAN COMPANY, Defendant-Appellee.)

(No. 55022;

First District (2nd Division)—December 11, 1973.

*Rehearing denied January 16, 1974.*

Clausen, Hirsh, Miller & Gorman, of Chicago (Fredric J. Grossman and James T. Ferrini, of counsel), for appellants.

Kralovec, Sweeney, Marquard & Doyle, of Chicago (John C. Doyle and Charles M. Biggam, of counsel), for appellee.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This is an appeal from a judgment entered after a directed verdict at the close of plaintiffs' case. The issues arise from a controversy between two groups of corporations concerning liability for certain damages to plaintiffs' personal property. Kroch's & Brentano's, Inc., Joseph Salon Shoes, Inc. and Edison Brothers Shoes, Inc., the plaintiffs, filed a suit against defendants Barber-Colman Company and Northern Weathermakers alleging that as a result of breaches of contract and negligence, an air handling unit malfunctioned and caused water damage to equipment and stock which were separately owned by the plaintiffs.

During presentation of their evidence, plaintiffs settled with Northern Weathermakers. The cause then proceeded against Barber-Colman, the remaining defendant. In making out their case, plaintiffs introduced evidence consisting of five exhibits and the testimony of six witnesses. This evidence disclosed the following facts.

On November 22, 1961, Kroch's, Joseph and Edison Brothers occupied separate stores in the Old Orchard Shopping Center, Skokie, Illinois. Kroch's store was in an upper level, with part of the premises used for a stockroom. In the stockroom, attached to the ceiling, was a Carrier air handling unit that used water fed into it from a central source in the shopping center. The air unit was 20 feet long; and at various points, its distance from the floor ranged from 8 to 15 feet. It was so located that no part of it, including the controls for operation of its mechanical parts, could be reached without a ladder. The stores owned by Joseph and Edison Brothers were directly underneath Kroch's stockroom and the air handling unit.

The unit was installed either by Barber-Colman or by Northern Weathermakers when Kroch's opened its Old Orchard store in 1957. Its controls were manufactured and installed by Barber-Colman, with some of the work being done by Joseph Serra, one of its employees. The controls had names or designations given them by Barber-Colman. Three of these have relevance to the controversy in this case.

The first was designated T1. This control is a mixed air thermostat which operates by the use of sensing bulbs placed inside the ducts of the unit. It is set as a predetermined temperature, normally 50-55 degrees so as to regulate the influx of cold air into the unit. Fresh air will not enter the air handling unit below the setting of T1. The second was designated T4. This control is a low temperature protection thermostat

device that operates to prevent freezing of water within the unit in the event T1 is set below freezing level. The normal setting of T4 is 42 degrees; and when that temperature is reached, this control automatically shuts off the unit and closes the fresh air dampers. T4 acts as a safety to prevent influx of air into the unit below its 42-degree setting. Thus, if T1 is set at a below freezing temperature, there will be no freezing of water within the unit, if T4 functions properly. The third was designated M1. This is a fresh air control motor which operates the air dampers leading to the outside of the air unit. The setting of T1 controls the operation of cold air in the unit and regulates the influx of cold air. In the winter season, a time clock, installed by Barber-Colman, shut off the entire air handling unit some hours after the store was closed, thereby placing it on an economy cycle by closing the dampers and recirculating the air within the store.

Sometime during the fall of 1961, Kroch's Old Orchard store began to experience overheating. Northern Weathermakers was called; but its representative, after examining the air unit, reported that he could not rectify the problem. He suggested, instead, that the manufacturer of the controls be called because there appeared to be a problem within the mechanisms that operated the unit. Accordingly, a request was made, and on November 22, 1961, Joseph Serra, one of the Barber-Colman employees who had worked on the installation of the unit in 1957, came to look at the controls. Using a ladder, he located and checked the weather valve to determine whether it was functioning; he checked but could not tell whether the time clock was functioning; he calibrated the room thermostat and then recalibrated it to alleviate the overheating problem; he tested the functioning of T1 by inserting a thermostat in the mixing chamber and checked the temperature to correspond with the setting of T1; he checked the M1 control motor to see if it was functioning properly; he moved the setting of T1, turning it up and down to test the control function. However, he did not test T4. "I could not tell whether T4 was functioning or not." According to William McCarthy, Kroch's manager, from November 22, 1961 until the early morning hours of December 8, 1961. Serra was the last person to touch the air handling unit or its controls.

On December 7, 1961 at about 11:00 P.M., McCarthy closed the store for the night. At about 4:00 A.M., on the morning of the 8th of December, McCarthy was informed by telephone that "something was amiss" at the store. He went there and found water pouring out of the front door. He saw about four inches of water throughout the premises and saw water pouring from the ceiling of the stockroom in the rear. The water was coming from the vicinity of the air handling unit. The Skokie Fire

Department was called; and two firemen, one the deputy chief and the other the first officer of the department, testified for plaintiffs that when they arrived at Kroch's, they saw water running from the air handling unit. They described the effect of the water that entered the stores owned by Joseph and Edison Brothers. Later that afternoon, Edward McLean who testified for plaintiffs as an expert, was called to Kroch's store as a consulting engineer to inspect the area and determine where the water came from. He examined the air unit and its controls. He found T1 set at 20 degrees Fahrenheit. He testified that in his opinion, the water which had damaged plaintiffs' stores came out of the air unit because its cold water coil had burst from freezing. The freezing, McLean told the jury, was caused by the 20 degrees setting of T1 and the inappropriate location of T4. Without objection from defendant, it was proved that Kroch's sustained water-damage loss in the amount of $7,903.79. The parties stipulated that Edison Brothers sustained a loss of $1,322.33.

To prove the damage it suffered when the air handling unit malfunctioned, Joseph Salon Shoes called Leon Couture, an insurance adjuster with 27 years' experience. Couture told the jury his qualifications and described how he went to the Old Orchard Shopping Center where he inspected the store owned by Joseph's in order to determine the fair and reasonable cost of repairing the water damaged property. He said that, as was customary, he took notes of the damage to the fixtures, the carpeting, the wall decorations "* * * in fact, everything that was water contaminated, item by item." Barber-Colman, however, objected to Couture's testimony on two grounds: (1) he was not an expert; (2) he did not testify to the condition of the damaged personal property before the malfunctioning of the air unit. After hearing the parties, the trial court sustained the objection. Plaintiffs then made an offer of proof that if allowed to answer the questions asked him, Couture would testify and give evidence of the reasonable costs of repairing the water-damaged personal property. The offer was rejected, and the jury was instructed to disregard his testimony.

Thereafter, the last of six witnesses testified and plaintiffs rested their case. Defendant then moved the court for a directed verdict. The motion was sustained, a directed verdict was returned against plaintiffs, and judgment was entered in favor of defendant Barber-Colman. A short time later, plaintiffs' post-trial motion was denied. Two issues are presented for review: (I.) Whether the trial court erred when it sustained defendant's objection to Leon Couture's testimony. (II.) Whether the trial court erred when it granted defendant's motion for a directed verdict at the close of plaintiffs' case.

## I.

When defendant objected to Leon Couture's testimony, there was a discussion in the trial judge's chambers followed by a recess. Later, on reconvening of the court, the judge called the lawyers' attention to *Lucas v. Bowman Dairy Co.,* 50 Ill.App.2d 413, 200 N.E.2d 374, a decision of this court in which it was held that in a suit to recover damage to personal property that is not repairable, or which has been treated as nonrepairable, the measure of damages is the difference between the value of the personal property immediately before and the value immediately after the occurrence that causes the damage. Therefore, in such a case, lack of testimony concerning the condition and value of nonrepairable personalty just before it is damaged is fatal to any action to recover for its loss. *Lucas* was a case in which furniture was damaged and treated as not repairable before suit was brought to recover for its damage.

In this case, Couture testified that on December 8, 1961, he went to the Old Orchard store of Joseph Salon Shoes to make an estimate of the fair and reasonable value of the costs to repair water-damaged property. When plaintiffs made their offer of proof concerning his testimony, they stated that if he were allowed to answer the questions put to him, Couture would testify and give evidence of the reasonable costs of repairs of the carpeting, the padding, a bell, a sofa, the accoustical ceiling and the damage that required decorating and cleaning.

■■ Generally, if damaged personal property is repairable, the measure of damage is the reasonable costs of the repairs plus the difference in value, if the value after repairs is less than the value before the damage. (*Behrens v. W. S. Bills & Sons, Inc.,* 5 Ill.App.3d 567, 283 N.E.2d 1.) This was the rule applicable to the case before us. Consistent with this rule, Leon Couture testified that he had been an insurance adjuster for 27 years, with experience in estimating the reasonable costs of repairing damaged personal property. He explained to the jury how he went about his work; he told them that he was testifying only about repairable but damaged personal property whose age and depreciation were taken into account when he determined the reasonable costs of their repair. He was not testifying about nonrepairable personalty; consequently, he did not have to know their condition and value before the occurrence that caused damage. (Compare *Lucas v. Bowman Dairy Co.,* 50 Ill.App.2d 413, 416, 200 N.E.2d 374.) He was a qualified and competent witness. (See *Landfield Finance Co. v. Feinerman,* 3 Ill.App.3d 487, 279 N.E.2d 30; compare *McCracken v. Farmers Grain Co.,* 215 Ill.App. 551.) Therefore, the trial court erred when it sustained defendant's objection to Couture's testimony.

## II.

■■ Defendant's motion for the directed verdict raised a legal question: whether the evidence at the close of plaintiffs' case, viewed most favorably to them, so overwhelmingly favored defendant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504; *Waters v. Futuristic Homes, Inc.*, 131 Ill.App.2d 143, 268 N.E.2d 165.) Invoking this principle, plaintiffs contend that the evidence did not overwhelmingly favor defendant. Plaintiffs argue that a contrary verdict based on their evidence could stand. Therefore, they insist, the trial court erred when it sustained defendant's motion.

Plaintiffs argue that they were not required to produce direct evidence of defendant's negligence. Their case, they maintain, could have been, and was in fact proved by circumstantial evidence. For example, plaintiffs point out that the evidence, which stands uncontradicted, established that Joseph Serra, the Barber-Colman employee, on November 22, 1961 adjusted the air thermostat of the unit, the T1 control. McCarthy, the store manager, testified that Serra was the last person to touch the unit or its controls. The testimony of at least three witnesses showed that the controls were inaccessible except with a ladder. Edward McLean, the consulting engineer, testified that he examined T1 on December 8, 1961 and found it set at 20 degrees. Serra testified that if T1 were set at 20 degrees, M1 would have to keep the fresh air dampers open so the air could come down to that setting. McLean, however, testifying as an expert, told the jury that M1 did not function because it had been installed in an unappropriate location. Consequently, when the temperature went below 32 degrees, the water in the cooling coil froze, expanded and burst. It was this bursting that caused the water to flow out of the air handling unit and damage plaintiffs' personal property.

Defendant counters with the argument that the trial court did not commit error when the motion for directed verdict was sustained. It maintains that the rule of *Pedrick* not only allows but demands that a trial judge consider all the evidence when acting on a motion for a directed verdict. If, after such consideration, a verdict in favor of the party opposing the motion is based on speculation, conjecture or surmise, the court must direct a verdict in favor of the moving party. Based on this principle, defendant insists that plaintiffs' theory of the case rested on three separate but concurring events, on each plaintiffs had the burden of proof. (1.) T1 was wrongly adjusted. (2.) T4 was improperly installed. (3.) The night cycle assembly malfunctioned. Defendant contends that plaintiffs failed to prove the occurrence of any of these events.

■■ It was the jury that had to determine the facts of this case, disputed

as well as undisputed, and draw from them the reasonable inferences they support. (*Cassata v. City of Chicago,* 127 Ill.App.2d 266, 270, 262 N.E.2d 240.) It was the jury that had to determine what inferences it would draw from the circumstantial evidence that constituted an important part of plaintiffs' case. (See *Marian v. Lena Pellet Co.,* 120 Ill.App.2d 131, 137, 256 N.E.2d 93.) Generally, where conflicting inferences may be reasonably drawn from evidence, resolution of the conflict is peculiarly within the province of the jury. *Reed v. Williams,* 9 Ill.App.3d 742, 744, 292 N.E.2d 426.

Therefore, when plaintiffs rested their case, the jury, determining the facts, deciding what inferences were to be drawn from the circumstantial evidence and resolving the conflicting inferences, could have found that when defendant Barber-Colman installed the air unit for Kroch's in 1957, it negligently placed the T4 control in an inappropriate place; and that on November 22, 1961, Joseph Serra, its employee, went to Kroch's store and set T1 at 20 degrees. The jury could also have found that during the night of December 7, there was a drop in the temperature below 32 degrees; that because of the inappropriate location of T4, it did not function and the water in the coils of the air handling unit froze causing them to burst. The bursting caused water to flow out of the unit, damaging plaintiffs' personal property. In our judgment, had defendant not introduced any evidence after the close of plaintiffs' case, and had the jury returned a verdict in their favor, based upon these facts, that verdict could stand.

■■ For these reasons, it cannot be said that when the court ruled on the motion for directed verdict, the evidence so overwhelmingly favored defendant that no contrary verdict based on that evidence could ever stand. (See *Wright v. Stech,* 7 Ill.App.3d 1068, 288 N.E.2d 648; compare *Grand Trunk Western R.R. Co. v. M. S. Kaplan Co.,* 43 Ill.App.2d 230, 193 N.E.2d 456; *Olsen v. Pigott,* 39 Ill.App.2d 191, 188 N.E.2d 361.) We conclude that it was error for the trial court to sustain defendant's motion for a directed verdict. *Larson v. Harris,* 77 Ill.App.2d 430, 222 N.E.2d 566, aff'd, 38 Ill.2d 436, 231 N.E.2d 421.

The judgment is reversed and the cause is remanded for a new trial.

Reversed and remanded.

STAMOS, P. J., and HAYES, J., concur.