LILLIAN PELUSO, Adm'r of the Estate of Thomas H. Peluso *et al.*, Plaintiffs-Appellees, *v.* SINGER GENERAL PRECISION, INC., *et al.*, Defendants-Appellants.

First District (5th Division)   No. 61967

Opinion filed April 7, 1977.

SULLIVAN, P. J., specially concurring.

Kirkland & Ellis, of Chicago (Gary M. Elden, Bruce A. Hubbard, and Scott E. Early, of counsel), for appellants.

Philip H. Corboy and Associates, of Chicago (Philip H. Corboy and Thomas A. Demetrio, of counsel), for appellee Lillian Peluso.

Clausen, Miller, Gorman, Caffrey & Witous, of Chicago (James T. Ferrini and Frank L. Schneider, of counsel), for appellee National Engineering Company.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Defendants appeal from a judgment in favor of plaintiff Lillian Peluso as administrator for $519,000 arising from the death of her husband in an explosion and from a judgment in plaintiff National Engineering Company's (National) favor for $1,727 in punitive damages and for

$151,306.91 in property damage occasioned at National's laboratory, the site of the explosion.

Defendants contend the trial court erred when it (1) prevented their theory of a natural gas explosion from being presented to the jury; (2) prevented cross-examination of Peluso's expert economist regarding reductions in deceased's future earnings by income taxes; and (3) permitted National to establish its property damage on a cost of repair theory without a proper foundation.

National contends this appeal must be dismissed because defendants have abandoned the original relief requested in their notice of appeal.

Plaintiff Peluso's complaint alleged that defendants' negligence on December 13, 1968, was the proximate cause of the death of her husband, Thomas, when a mixing machine filled with a chemical mixture of defendants, known as LOD939, exploded at National's laboratory where Thomas worked as a chemist. She prayed for damages for his wrongful death and for damages for the pain and suffering which he experienced during the period between the explosions on December 13, 1968, and his death on December 14, 1968.

National's four-count complaint in a separate cause was based upon theories of negligence, strict liability, wilful and wanton misconduct, and the breach of an express warranty. It prayed for both property and punitive damages arising from the explosion in its laboratory and plant at 1716 West Hubbard Street.

Both cases were consolidated and the following pertinent evidence was adduced at trial.

*For plaintiffs:*
*Henry W. Dienst, a vice-president of National in 1968*

National designed, engineered and sold industrial mixing equipment. National's customers could test its equipment at its performance laboratory to see if it would meet their needs. Although National made mixers for use with pyrotechnic materials and for use with explosive materials, it never mixed explosives in its Hubbard Street laboratory. Standard mixers were made of carbon steel, but mixers for explosives were made of stainless steel in a streamlined design and were equipped with explosion proof motors. National's customers would select the type of mixer to be used for the test.

*Robert J. Donat, an assistant chief engineer for National*

He designed the mixer used in the laboratory on December 13, 1968. The mixer was not designed for mixing explosives. There was an exhaust fan above the mixer and a standard open-type motor beneath the mixer. After the explosion, a handle on the machine was missing and a chute under the bottom discharge door was bent.

*Martin Dale Plejdrup, west coast sales representative for National*

Defendant Joseph Philipson inquired about mixing 30 pounds dry weight of an inert thermite material. Philipson told him that an explosion proof motor and starter, an air operated discharge door, and other standard features for pyrotechnic mixing were not required. Philipson never warned of any hazard that might result if the material was not kept damp. When used to mix pyrotechnics, a mixer would generally be placed in a remote area in a building with a blow-out roof.

*James Stewart, assistant sales manager for National*

National was a specialist in mixers, but not in their customer's products. National would request its customers to send a representative to direct the mixing of their products. National would not mix explosives.

Philipson wanted to mix molybdenum trioxide and aluminum powder. Philipson said the LOD939 mixture was a pyrotechnic which would ignite and glow at a high temperature, but which would not explode. He would not have mixed the LOD939 if he knew it could have exploded.

Philipson, Thomas Peluso, and he mixed two batches of LOD939 on December 12, 1968. Philipson decided upon the volume and percentages of the various ingredients that would be used. They decided to leave the second batch in the mixer overnight. Philipson did not discuss the safety of leaving the mixture, but did suggest the wet mixture might pick up moisture from the air.

He saw Thomas Peluso in the laboratory the next morning before he left to answer the telephone. At approximately 8:55 a.m. a sharp cracking explosion blew the telephone receiver out of his hand. When he returned to the laboratory he found the mixer was charred and the discharge door was hanging.

On cross-examination, he admitted that Bert Troy, a National employee, had told him that he could see no reason for not mixing this material in the laboratory. Although he had previously testified it was not unusual for National to conduct tests on this type of material, he had meant the mixing of inert substances.

*Defendant Joseph Philipson under section 60*

He was a consulting engineer hired by the Link Ordinance Division of Singer General Precision Corporation. He was attempting to streamline the production process of LOD939 which was a heat producing material used to light the primary explosive in bombs. He had observed LOD939 being produced at a Link plant in Sunnyvale, California. The plant was on an abandoned NIKE missile site in a remote area. He told James Stewart that LOD939 was not an explosive. He also told Martin Plejdrup that the material was inert and that explosion proof motors, remote drive operation and close tolerance machining would not be required. He assured Plejdrup there was no danger if the material was not kept damp.

Stewart told him the LOD939 should not be entirely dry. The burning rate of LOD939 depends upon the particle size of the material with the smaller particles burning faster.

The second batch of LOD939 which was mixed on December 12, 1968, and was stored overnight had been heated to remove any water. When the mixer was turned off the LOD939 appeared to be dry and the particles were smaller than the first batch and smaller than desired for production. He warned Stewart, outside of Thomas Peluso's presence, not to smoke in the laboratory. He never told Peluso to wear conductive shoes or asbestos work clothes. Although Link had used conductive bags because they prevented sparking from static electricity, he did not tell anyone at National that their nonconductive, polyethylene bags should not be used to store the mixture. He did not advise Peluso to use a remote motor on the mixer.

The main force of the explosion occurred near the mixer. After the explosion the mixer was charred and no LOD939 was present. He admitted it was probable the liberation of energy from the LOD939 killed Peluso and that his burns came from the LOD939.

*C. E. Bert Troy, Technical Director for National*

He did not recall discussing the mixture with anyone prior to December 12, 1968. LOD939 was a thermite which would release a great amount of heat, but would not explode. A temperature in excess of 900° F or 1100° F would be necessary to ignite a thermite. The presence of water would retard a thermite reaction. The mixer was suitable and safe for mixing LOD939. There were no gas lines into the laboratory and there were no gas leaks in National's gas system. The center of the explosion occurred below or at the discharge point of the mixer. He believed the thermite ignited and an explosion followed. Any mixture could be explosive under the right circumstances.

*Robert E. Parr*

He was an investigator of explosives for People's Gas, Light and Coke Company. A chemical explosion involving a metallic or aluminum powder occurred in the laboratory. The explosion did not occur inside the mixer, but rather outside and all around it. No other fuel, either natural gas or oil, was involved in the explosion. There were two impact fractures to a gas line caused when the west wall of the laboratory was driven into the pipe by the explosion. The fractured gas pipe was an effect of the explosion and not a cause of it.

*Officer Frank R. Kasky, a Chicago police department officer*

He was a member of the Bomb and Arson Squad for 14 years. His investigation showed that the explosion originated around the mixer. He observed a silvery material throughout the room. In his opinion, this aluminum powder mixture was the cause of this explosion. He admitted

that thermite materials would burn but not explode and that National's technical director referred to the mixture as being a thermite.

*Edward J. Ryan, a serviceman for the gas company*

He had no experience as an explosion or fire investigator. A three-quarter-inch gas pipe was broken off at a fitting near a gas meter.

*Paul Martin Kierkegaard, chief chemist for FMC Corporation*

LOD939 is an explodable thermite. The Bureau of Explosives classifies LOD939 as a Class B explosive. The Bureau of Mines and the National Fire Code rate aluminum as a very explosive material in dust form. The drier and finer the LOD939 became, the more likely it would have been to ignite and to burn. Whenever he conducted tests on LOD939, he had used a large room in a separate part of the facility and had employees wear protective goggles, conductive shoes and a flame resistant shop coat.

In his opinion, aluminum dust caused an explosion outside the mixer. Possible sources of ignition for the dust explosion included switches on the motors, friction from the mixer's doors or from tools used to scrape the mixer, static electricity from a lab technician's body, and charges found in polyethylene bags.

During cross-examination he admitted it took a temperature of 900° F to 1000° F to ignite the LOD939 and that a cement mixer with a nonexplosion proof motor was being used to mix LOD939 at Link's California facility.

After being asked to assume several facts including the fact that after the explosion two broken gas pipes were found, the following colloquy occurred:

"Q. Now, with those basic assumptions in mind, let me ask you the following questions. If the natural gas accumulated in the ceiling or in the walls in this room—

A. Yes, sir.

Q. And exploded?

A. Yes, sir.

Q. Would that be a sufficient amount of force to blow the cover off of the mixer?"

Plaintiff Peluso objected on the ground that there was no evidence that any natural gas accumulated or exploded. After a hearing on her objection, which occurred outside of the jury's presence, the trial court sustained the objection and thereafter instructed the jury to delete any references to the accumulation or explosion of natural gas from the question.

*Donald A. Jendro, a mechanic at National's plant*

On December 13, 1968, at approximately 8:30 a.m. he saw Thomas Peluso, a laboratory technician for National, sitting at a counter in the laboratory about eight to ten feet from the mixer. At approximately 8:45

a.m. he heard an explosion and returned to the laboratory. Peluso was lying on the floor in the southwest corner of the laboratory by the opposite wall from the mixer. He did not see any clothing or shoes on Peluso. Peluso was moaning. There were no unusual smells in the laboratory.

*Anthony Palermo*

He saw his friend Thomas Peluso at the hospital on December 13, 1968. Thomas was in great pain and his body looked like a burned steak although it was covered with salve. Thomas nodded his head when spoken to.

*Terry Jo Tasche, a registered nurse at the Cook County Hospital Burn Unit.*

Eighty-nine percent of Thomas Peluso's body was burned. Eight percent of these burns were full thickness burns which went through all layers of his skin. An escharotomy, in which the skin is cut through all its layers so that the blood could flow, was performed on Thomas' chest, arms and lower legs. A tracheotomy was performed to allow breathing. Thomas was conscious and in pain. He was given morphine on six occasions. He died on December 14, 1968, at 8:20 p.m. from toxemia caused by the burns.

*Plaintiff Lillian Peluso*

She and Thomas Peluso were married two weeks before he died. He was conscious when she saw him at Cook County Hospital.

*Robert E. Miller, an economist*

Based upon Thomas Peluso's job his actual earnings at the time of his death and his work life expectancy, Thomas had a demonstrated earning capacity of $393,000. The demonstrated earning capacity of members of his cohort group with the same education was $483,100 and that of members of his cohort group who were technicians was $611,405.

During cross-examination, defense counsel inquired whether these figures represented only gross income. The witness replied in the affirmative. Defense counsel then began to ask "and that does not take—" whereupon plaintiff objected. Plaintiff requested that the effect of income taxes on these earnings not be mentioned citing *Hall v. Chicago & North Western Ry. Co.* (1955), 5 Ill. 2d 135. The trial court sustained plaintiff's objection. Thereupon defense counsel withdrew his last question.

*Thomas Curtin, a vice-president of National*

He was in charge of the work done to repair and to restore the laboratory and building at 1716 West Hubbard. He identified and explained several photographic exhibits which showed the building and laboratory before and after the explosion.

He also identified several paid bills and invoices, totalling $172,321, which related to work done in repairing the building. Defendants

objected to the introduction of these exhibits in evidence on the ground that no theory of recovery had been presented. National represented that the figures were offered on a cost of repair theory and not a difference in value theory, and offered that Curtin would testify as to what work was required as a result of the explosion and what work had been done. The trial court admitted the bills and invoices in evidence.

During cross-examination Curtin admitted the improvements resulted in a better building, but later stated these improvements referred only to changes required by the building code.

*For defendants;*

*John Kauffman, chief engineer and a vice-president of National in 1968*

Although he admitted he did not know the cause of the explosion, in his opinion a thermite reaction occurred based upon the fire evidence found in the laboratory. A dust explosion did not occur. The mixer was in the open or discharge position after the explosion.

*Dennis M. Michaelson, a consultant in fires and explosions*

He investigated this occurrence for National. The explosion originated beneath the chute or spout of the mixer. He found an aluminum oxide powder covering most of the laboratory. In his opinion, an aluminum dust explosion occurred which could have been avoided if proper safety precautions had been followed.

He also found a hole in the ceiling which indicated the presence of a flammable, lighter than air, gas. There was nothing in his report to National, nor had he ever considered, the explosion to be caused by natural gas from the gas company.

Although he had conducted tests with these chemicals, he was never able to produce an explosion. He later admitted that he had never tested LOD939 in a suspended state.

*Defendant Joseph Philipson, on his own behalf*

In his opinion a natural gas explosion occurred which ignited the LOD939 and spread the aluminum oxide throughout the laboratory. His opinion was based upon the break in the gas pipe in the room next to the laboratory. He did not know how much gas, if any, was leaking from the pipe. He first became aware a gas line was broken in the room next to the laboratory during the testimony of Robert Parr.

The LOD939 burned, but it did not explode. He admitted the LOD939, not the natural gas, burned Thomas Peluso.

During cross-examination, he admitted that neither his original 12-page report nor his subsequent condensed report indicated a gas explosion. He did not mention a gas explosion in a statement given to defendants' counsel before he was made a party to this cause. He also admitted previously stating under oath at a deposition given before he was made a party to this cause that he did not know what caused the explosion. After

he was made a party, he also testified at a deposition that he did not know the cause of the explosion. He admitted that recognized authorities in the field of pyrotechnics recommended storing aluminum dust separate from oxidizing materials, keeping the working area free from dust, using explosion proof motors, using hoods to collect particles near mixers, grounding all electrical equipment, wearing cuffless trousers and aprons without pockets, and using soft brushes for cleaning the equipment.

*For plaintiffs on rebuttal:*

*Arthur A. Krawetz, a chemist who investigated this occurrence in February, 1969.*

In his opinion, a dust explosion of the LOD939 occurred in front of and below the mixer. An alternative cause of the explosion was the aluminum dust. The absence of burning in and about the building indicated that a natural gas explosion did not occur.

During plaintiff Peluso's closing argument on rebuttal, the trial court, over defendant's objections allowed plaintiff's counsel to argue the following:

> "I was accused of being a smart lawyer, remember, a half-hour ago, a clever lawyer. Well, if I am so smart and I am so clever wouldn't I sue the gas company if I believe that that is what caused this guy's death? * * *
> Wouldn't somebody have sued the gas company if they thought and let them fight it out amongst themselves."

Following the entry of the trial court's judgment, defendants filed a post-trial motion which requested that the judgment be vacated and set aside, and that the trial court either enter judgment notwithstanding the verdict in defendants' favor or grant defendants a new trial. The trial court denied defendants' post-trial motions.

In their notice of appeal defendants stated that they:

> "* * * hereby appeal from the Judgment entered herein on November 18, 1974 and from the Order denying defendants' Post Trial Motion entered on February 28, 1975.
> The Defendants-Appellants request the Appellate Court of Illinois to reverse the Judgment of the Trial Court and to enter judgment in favor of defendants-appellants in the Appellate Court."

OPINION

■■■ At the outset, National contends this appeal must be dismissed because defendants have abandoned the relief requested in their notice of appeal, *i.e.*, a reversal of the trial court's judgment and the entry of a judgment for defendants, by now seeking a reversal and remandment for a new trial on all or part of the issues in their original brief in this court.

Supreme Court Rule 303(c)(2) requires that a notice of appeal specify the judgment or part thereof appealed from and the relief sought. (Ill. Rev. Stat. 1973, ch. 110A, par. 303(c)(2).) The notice of appeal vests jurisdiction in the appellate court and informs the party in whose favor a judgment has been rendered that the appellant will seek a review of the case. (*Wells v. Kern* (1975), 25 Ill. App. 3d 93, 322 N.E.2d 496; *Department of Transportation v. Galley* (1973), 12 Ill. App. 3d 1072, 299 N.E.2d 810.) In *National Bank of the Republic v. Kaspar American State Bank* (1938), 369 Ill. 34, 15 N.E.2d 721, our supreme court held that under former Rule 33 (now Rule 303) the failure to include a prayer for relief in the notice of appeal is merely an error in form and not an error of substance and that the appellate court does not lose its jurisdiction by technical errors of this sort where an appellee is not otherwise prejudiced. Here, defendants' notice clearly apprised National that defendants were appealing from the trial court's judgment and from the denial of their post-trial motion which included a prayer for a new trial. Moreover, unlike the notice in *National Bank of the Republic*, defendants' notice here included a request for relief, albeit not the relief requested in their original brief in this court. Unlike the appellants in *McCottrell v. Benson* (1961), 32 Ill. App. 2d 367, 178 N.E.2d 144, and *City of Chicago v. Baran* (1972), 6 Ill. App. 3d 29, 284 N.E.2d 320, cited by National, defendants here have neither changed their original allegations contained in the notice nor specifically prayed that the cause not be remanded for a new trial. We cannot find that National has been prejudiced by defendants' notice of appeal and, therefore, we reject National's contention that this appeal must be dismissed.

Defendants first contend the trial court erred when it prevented their theory of a natural gas explosion from being presented to the jury. They argue that the evidence on causation was close and, consequently, the trial court erred when it limited the cross-examination of one of plaintiffs' expert witnesses, and when it allowed Peluso's counsel to argue that the absence of a suit against the gas company foreclosed the possibility of a natural gas explosion.

To the contrary, we believe the evidence clearly supported plaintiffs' theory of a chemical explosion as a proximate cause of the injuries. Six witnesses testified that either the LOD939 had burned or had exploded, a component of the LOD939, the aluminum dust, had exploded, or a hydrogen gas by-product of the LOD939 had exploded. Among the witnesses were disinterested third parties and one of defendants' own witnesses. In addition, defendant Philipson admitted that regardless of the cause of the explosion it was the LOD939 which burned Thomas Peluso.

Defendants were not precluded from presenting their natural gas

explosion theory to the jury. Philipson testified on direct examination that a natural gas explosion had occurred. We believe, however, that his testimony was impeached so that the jury could not help but give it little probative value. On five separate occasions, both before and after he was made a party to this cause, Philipson had stated he did not know what caused the explosion. Moreover, his opinion was based solely upon the testimony of Robert Parr, an investigator, who testified the gas line in the next room was broken by the force of the explosion and thus was an effect, not a cause, of the explosion. Finally, Philipson had no idea how much gas, if any was leaking from the ruptured pipe.

Consequently, although we have reviewed defendants' arguments concerning closing argument and the cross-examination of one expert witness, we have not done so from the perspective that the causation issue was a close question of fact.

■■ ■ Although we believe Peluso's counsel's argument that Lillian Peluso would have sued the gas company if she believed it caused Thomas Peluso's death was improper and that the trial court should have sustained defendants' objection, this error is not reversible by itself. Arguments concerning why a party was not sued, though improper, do not constitute reversible error unless a defendant can show it was prejudiced thereby and denied a fair trial. (*Trippel v. Lott* (1974), 19 Ill. App. 3d 936, 312 N.E.2d 369.) Here, the isolated remarks must be examined in light of the clear evidence on causation and Philipson's injection of a gas explosion theory. Adter reviewing the record in this regard, we reject defendants' contention that they were denied a fair trial by Peluso's counsel's argument.

Defendants also argue that it was error to refuse to allow one of plaintiff's experts, Paul Kierkegaard, to answer a hypothetical on cross-examination concerning the possibility of a gas explosion. The hypothetical asked the witness to assume that natural gas had accumulated and then exploded. The record clearly shows that no evidence of a natural gas accumulation or explosion had been adduced before the hypothetical was posed. Defendants' reliance upon the testimony of Robert Parr is misplaced. Parr testified that natural gas was not involved, and that the fracture of the gas line in another room was an effect and not a cause of the explosion.

■■ Nonetheless, we note that it is within the sound discretion of the trial court to allow a hypothetical question although the supporting evidence has not already been adduced if the interrogating counsel gives assurance it will be produced later. (*Gibson v. Healy Brothers & Co.* (1969), 109 Ill. App. 2d 342, 248 N.E.2d 771.) A careful review of the record has disclosed that defense counsel did mention in chambers that a defense witness, Dennis Michaelson, would testify to the presence of

natural gas. However, we note that Michaelson subsequently testified that the explosion was caused by aluminum dust and that he had never considered natural gas as the explosion's cause. Consequently, even if we consider defense counsel's proffer as to Michaelson's testimony to be an assurance of subsequent testimony that gas had accumulated and exploded, Michaelson's actual testimony shows that defendants were not prejudiced by the trial court's refusal to allow the hypothetical. In light of these facts, we cannot say the trial court abused its discretionary powers in refusing to allow a hypothetical question which had the potential to mislead the jury.

Defendants next contend the trial court erred when it prevented cross-examination of Peluso's expert witness, economist Robert Miller, regarding reductions in deceased's future earnings by income taxes. Defendants do not argue that they should have been allowed to introduce the effect of income taxes on the jury's award. (See *Raines v. New York Central R.R. Co.* (1972), 51 Ill. 2d 428, 283 N.E.2d 230, *cert. denied,* 409 U.S. 983, 34 L. Ed. 2d 247, 93 S. Ct. 322.) Rather, defendants argue that the jury should have been allowed to consider income taxes as they would have diminished deceased's projected earnings and, thus, Lillian Peluso's damages for her pecuniary loss as allowed under the Wrongful Death Statute. We do not believe that this issue is strictly controlled by two decisions with contain discussions of income tax in analogous situations, but under a different statute, the Federal Employers' Liability Act. (45 U.S.C. § 51 *et seq.*) In *Hall v. Chicago & North Western Ry. Co.* (1955), 5 Ill. 2d 135, 125 N.E.2d 77, our supreme court held it was error for defense counsel to argue that whatever amount the jury might award would not be subject to Federal income taxation. In *dicta,* the court also stated the trial court's ruling that evidence of gross earnings before taxes was proper on the issue of earning capacity appeared to be in accord with the weight of authority. Similarly, in *Wawryszyn v. Illinois Central R.R. Co.* (1956), 10 Ill. App. 2d 394, 135 N.E.2d 154, this court held that although it was error to bring deductions of income tax to the jury's attention, the error was offset by a similar mistake in computing deceased's personal expenses and thus no prejudice had ultimately accrued to defendant.

■■ We must reject defendants' contention for two reasons. First, defendants have failed to preserve this issue for appeal. The record shows that during the in-chambers discussion over defendants' question, "and that does not take," defense counsel represented that he intended to show Miller's testimony related only to gross earnings devoid of references to taxes or expenses. Thereafter, defense counsel asked a series of questions, unobjected to by plaintiffs, which established that Miller was referring to gross earnings only. In *Harris v. Algonquin Ready Mix, Inc.* (1973), 13 Ill. App. 3d 559, 300 N.E.2d 824, *affirmed,* 59 Ill. 2d 445, 322

N.E.2d 58, we held that no appealable issue remained when a defendant dropped its line of questioning after an in-chambers argument and did not make an offer of proof following the trial court's adverse ruling. At no time did the defendants in this case proffer what Miller's testimony would have been. Defendants did not offer any competent witness during the presentation of their own case who could testify as to the effect of income taxes during deceased's projected 42.5 year work-life expectancy. Indeed, defendants did not even offer evidence on the effect of taxes upon deceased's projected earnings up until trial. We note in passing that even under those authorities which support defendants' position, *Cox v. Northwest Airlines, Inc.* (7th Cir. 1967), 379 F.2d 893; *McWeeney v. New York, N.H. & Hart R.R. Co.* (2d Cir. 1960), 282 F.2d 34, *cert. denied*, 364 U.S. 870, 5 L. Ed. 2d 93, 81 S. Ct. 115, and *Petition of Marina Mercante Nicaraguense, S.A.* (2d Cir. 1966), 364 F.2d 118, this evidence would be inadmissible because it did not have a "significant impact" on the computation of damages while deceased's salary was in the lower ranges of the middle income scale.

Defendants argue that they had no duty to make a formal offer of proof. An offer of proof is necessary in order to apprise the court of the substance of the testimony sought to be admitted. (*Del Rosario v. Del Rosario* (1970), 133 Ill. App. 2d 8, 270 N.E.2d 160; *Schusler v. Fletcher* (1966), 74 Ill. App. 2d 249, 219 N.E.2d 588.) We believe the salutory purpose of an offer of proof is especially apparent in this case where one of the major arguments against allowing evidence of this nature is that the projection of future income taxes is too uncertain due to vagaries in both the tax rates and the number of exemptions, exclusions, credits and deductions which a deceased might be entitled to receive during his lifetime, and that it would allow juries to engage in irrational speculations when computing pecuniary losses. (See *Jennings v. United States* (D. Md. 1959), 178 F. Supp. 516, *vacated and remanded on other grounds*, 291 F.2d 880, (4th Cir. 1961), *original judgment affirmed on remand*, 207 F. Supp. 143 (D. Md. 1961), and 318 F.2d 718 (4th Cir. 1963); *Bergfeld v. New York, Chicago & St. Louis R.R.* (1956), 103 Ohio App. 87, 144 N.E.2d 483.) Thus, while we recognize the importance of this issue, we believe it would be improper to adopt a rule of law for this jurisdiction based solely upon a partial question asked in cross-examination and absent any competent evidence on the application of taxes to the particular facts of this case.

■■ Second, even if we were to assume that the trial court's ruling was erroneous defendants have not shown that they were prejudiced by the ruling. A court of review can reverse a trial court's judgment only when an alleged error is shown to have been prejudicial to an appellant's right to a fair trial. (*McCormick v. Kopmann* (1959), 23 Ill. App. 2d 189, 161 N.E.2d

720; *Wawryszyn v. Illinois Central R.R. Co.* (1956), 10 Ill. App. 2d 394, 135 N.E.2d 154.) In the instant case, Lillian Peluso pleaded, and the jury considered, two separate demands for recovery—one, for her pecuniary loss under the Wrongful Death Statute and a second for Thomas Peluso's pain and suffering under the Survival Statute. The excluded testimony would have been relevant only to Lillian Peluso's pecuniary loss under the Wrongful Death Statute. The jury returned a single verdict which was well within the amount requested for Thomas Peluso's pain and suffering alone. Defendants did not submit special verdict forms to the jury which would have apportioned damages into the pecuniary loss and pain and suffering categories although they were authorized to so move by section 68(3) of the Civil Practice Act. (Ill. Rev. Stat. 1975, ch. 110, par. 68(3); *cf. Edenburn v. Riggins* (1973), 13 Ill. App. 3d 830, 301 N.E.2d 132; *Magnani v. Trogi* (1966), 70 Ill. App. 2d 216, 218 N.E.2d 21; Lawless, *Computation of Future Damages; A view from the Bench,* 54 Geo. L.J. 1131 (1966).) Consequently, we would now have to engage in speculation and conjecture to determine whether the excluded testimony had any prejudicial effect on the jury's verdict because damages could have been based solely upon Thomas's pain and suffering during the 35 hours he survived while his body was fatally burned.

Defendants finally contend the trial court erred when it permitted National to establish its property damage on a cost of repair theory without a proper foundation. They argue that the improvements which resulted from repairs done to comply with existing building codes are not compensable citing *Stenger v. Hope Natural Gas Co.* (1954), 139 W. Va. 549, 80 S.E.2d 889. In *Stenger,* the Supreme Court of Appeals of West Virginia held the evidence was insufficient to sustain a finding that defendant gas company was negligent or that its negligence, if any, was the proximate cause of an explosion at plaintiff's dwelling. For the benefit of the trial court upon remandment, that court also stated that where the measure of damages is the difference in the value before the injury and the value after the injury, the admission of evidence of repairs required by local ordinances for the purpose of establishing the amount of damages recoverable constituted prejudicial error.

*Stenger* is inapposite to the case at bar. In Illinois, damages are generally measured by the cost of repair and not by the dimunition in value. (*Kroch's & Brentano's, Inc. v. Barber-Colman Co.* (1973), 16 Ill. App. 3d 412, 306 N.E.2d 522; *Fitzsimons & Connell Co. v. Braun* (1902), 199 Ill. 390, 65 N.E. 249.) Unlike the evidence in *Stenger,* National's evidence here relates directly to the controlling measure of damages for this jurisdiction. National produced evidence showing the condition of the building before and after the explosion and paid bills and invoices for repairs to the building, laboratory equipment, and other personalty which

repairs were required by damage caused by the explosion. Consequently, we will not be persuaded by the court's reasoning in *Stenger*.

■■ We hold that the cost of repair can include the expense neceseary to conform those repairs to existing building codes. To hold otherwise would encourage shortcuts in restoration and thus undermine the salutory purpose of local safety and building codes, and also would defeat the recovery of costs which are incident and necessary to effect the repairs. Moreover, in this case, National evidenced $172,321 in paid repair bills, but received only $151,306.91 in property damages. There is no evidence in the record to show that the jury's lesser award over-compensated National for its losses based upon expenses required by the building code. Because the evidence offered related to the correct measure of damages, we cannot say the trial court erred and we reject defendants' final contention.

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.

MEJDA, J., concurs.

Mr. PRESIDING JUSTICE SULLIVAN, specially concurring:

Although I agree in principle with the result reached by the majority here, I am not in accord with certain aspects of its reasoning in rejecting defendants' contention that they should have been allowed to examine plaintiff's economist to show that his computations did not include deductions for income taxes and personal expenses.

During cross-examination, after the economist had answered that his estimates of future loss of earnings were gross figures, defendants' attorney started to ask him another question, as follows:

"Q. And that does not take—."

At this point, plaintiff's counsel asked for and was granted a hearing in chambers, where he stated an objection to any questions concerning income taxes. He argued that *Hall v. Chicago & North Western Ry. Co.* (1955), 5 Ill. 2d 135, 125 N.E.2d 77, prohibited any such references, and defendants' counsel then stated he would demonstrate, through the witness, that the income figures to which he had testified "are simply gross earnings" and that they were "totally devoid of any references to taxes or expenses." At that point, the court sustained the objection and, thereafter, defense counsel made no further reference to income taxes—either during the trial or in his argument to the jury.

The measure of damages under the Wrongful Death Act is the

pecuniary loss to the beneficiaries occasioned by the death. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237. See also *Scully v. Otis Elevator Co.* (1971), 2 Ill. App. 3d 185, 275 N.E.2d 905.) Pecuniary loss has traditionally been held to consist of the value of the sum of monetary contributions and personal services the deceased would have provided. (*Scully; O'Fallon Coal & Mining Co. v. Laquet* (1902), 198 Ill. 125, 64 N.E. 767.) In this regard, we note that the Pattern Jury Instruction for damages in death actions, IPI-Civil No. 36.01, lists eight factors to be considered by juries in determining pecuniary loss. Among them are the amounts decedent customarily contributed in the past to his next of kin and what he spent for customary personal expenses. There is no question that decedent here, prior to his death, could not have made contributions of that which would have been paid in taxes or for his personal expenses, and it appears to me that pecuniary loss must necessarily be a net amount determined after deductions for those items.

*Hall*, relied upon by plaintiff, is not controlling of the issue here. It held in a personal injury action that a jury should not be informed that its damage award would not be subject to income tax and, while the application of *Hall* prohibits informing a jury in either a death or a personal injury action that the amount of its award of damages would not be taxable, it does not hold that defendant in a death action may not develop the fact that pecuniary loss was a net amount to be determined after deductions for taxes and personal expenses.

No Illinois court has decided this question, but it has been passed upon in Federal cases. In *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284 (9th Cir. 1975), an FELA damage award of $335,000 was set aside because evidence of the amount of personal income tax that would have been paid had decedent lived was refused. The court stated:

> "[W]e believe it altogether right and proper that in cases wherein the annual gross income is such that future taxes would have a substantial effect, evidence of the decedent's past and future tax liability should be admitted if a reasonably fair and accurate estimate of his lost future income is to be assured." (529 F.2d 284, 291.)

The *Boxberger* court also said that the exclusion of any evidence of future income taxes seriously prejudiced defendants, because the award substantially exceeded what the beneficiaries would have received had decedent lived "due to overcompensation in the form of pretax dollars that the survivors would never have received had the accident not occurred." (529 F.2d 284, 295.) Additionally, the *Boxberger* court rejected an argument that to permit a deduction for tax liability would involve too much speculation and uncertainty, stating:

> "[T]oday's sophisticated jurors surely have had some personal

experience in determining their own tax liability, and in today's tax-conscious society we are confident that our juries and judges, with the aid of such competent expert testimony as may be received, are equal to the task and the responsibility." 529 F.2d 284, 293.

In *Cox v. Northwest Airlines, Inc.*, 379 F.2d 893 (7th Cir. 1967), *cert. denied*, 389 U.S. 1044, 19 L. Ed. 2d 836, 88 S. Ct. 788, which involved an action under the Death on the High Seas Act for the death of a passenger in an airplane crash, the trial court, in a bench trial, computed pecuniary loss to the next of kin on the basis of decedent's probable future earnings, without any deduction for income taxes on those earnings. The court of appeals stated:

"The deceased's beneficiaries could not logically and reasonably have expected to receive the money he would have paid in such taxes had he lived. Only the net income would have been available for their support. And there can be no pecuniary loss of income which would not have been available for contribution." (379 F.2d 893, 896.)

Thus, it is my thought that defendants should have been allowed to cross-examine the economist to develop the fact that his computations included no deductions for income taxes and personal expenses.

I disagree also with the majority's holding that defendants failed to preserve this issue for appeal because no offer of proof was made by defendants after the trial court's adverse ruling. An offer of proof is unnecessary when the trial court understands the objection and character of evidence but will not admit the evidence (*Schusler v. Fletcher* (1966), 74 Ill. App. 2d 249, 219 N.E.2d 588), or where the question and the circumstances surrounding it are sufficient to indicate the problem and the admissibility of the evidence (*Creighton v. Elgin* (1944), 387 Ill. 592, 56 N.E.2d 825; *Ryan v. McEvoy* (1974), 20 Ill. App. 3d 562, 315 N.E.2d 38; *Mack v. Davis* (1966), 76 Ill. App. 2d 88, 221 N.E.2d 121).

Here, the in-chambers colloquy reveals the court and the parties were well aware of the fact that defendants were seeking to show that the computations of the economist did not consider income taxes and personal expenses. Under such circumstances, an offer of proof to repeat what was already known was not required. *Creighton; Schusler.*

It is my belief that *Harris v. Algonquin Ready Mix, Inc.*, relied upon by the majority in its opinion and by plaintiff in its brief here, is not controlling on this question. In *Harris*, plaintiff was injured when a crane came in contact with overhead high-tension wires and, when a witness was asked about a prior crane contact with wires, an objection was sustained. In the ensuing discussion in chambers, no statement or offer of

proof was made as to whether the prior touching had occurred under conditions substantially similar to those in the second contact and, in the absence thereof, the court held that no appealable issue remained. In the instant case, however, the discussion in chambers disclosed to the court exactly what it was that defendant wanted to show.

Finally, I express my disagreement with the holding of the majority that evidence of the effect of taxes on deceased's projected earnings "would be inadmissible because it did not have a 'significant impact' on the computation of damages while deceased's salary was in the lower range of the lower income scale."

While it is correct, as stated by the majority, that *McWeeney* and *Cox* support this concept, it is noted that in *Cox*, a death action, there was testimony as to projected future earnings of from $15,655 to $20,608 per year, and the court held that the impact of income tax involving such earnings had a significant and substantial effect in the computation of probable future contributions.

In *McWeeney*, an injury action, plaintiff's yearly income was $4,800—on which he would have paid $773 in income tax. The majority of the court upheld the refusal of an instruction that the jury, in determining future loss of earnings, should consider only plaintiff's net income after deducting income taxes, because the amount of the tax would not have significant impact on the award of damages. The majority also stated, however, that there may be cases of large potential earnings where failure to consider the income tax factor would produce an improper result. In a dissenting opinion, Chief Judge Lumbard rejected the "significant impact" concept, stating:

> "I submit that if the factor is relevant in any case it is relevant in every case. It can hardly be seriously argued that an item of $773 over McWeeney's life expectancy of 29 years, or about $22,000 before discount, is so insubstantial that a trial court may choose to disregard it." 282 F.2d 34, 43.

In the instant case, the economist testified to future loss of earnings, reduced to present cash value, of $393,000 to $611,000. With a 37-year life work expectancy, this would indicate projected earnings of from $10,700 to $16,500 per year—which, even in the light of the reasoning of either *McWeeney* or *Cox*, would have significant impact on the computation of future contributions.

For the reasons stated, it is my opinion that the trial court erred in not permitting defendants to develop the fact that the computations of plaintiff's economist did not include income taxes and expenses. However, I agree with the majority that defendants have not shown this error to be prejudicial. Error is generally not reversible without a showing of prejudice (*Tipsword v. Melrose* (1973), 13 Ill. App. 3d 1009, 301

N.E.2d 614; *Adamaitis v. Hesser* (1965), 56 Ill. App. 2d 349, 206 N.E.2d 311), and to entitle a party to a reversal of a judgment, he must show that the error has, or presumably has, resulted in an injury to him. *O'Fallon Coal and Mining Co.; Atz v. Goss* (1974), 21 Ill. App. 3d 878, 316 N.E.2d 29; *Harrison v. Rapach* (1971), 132 Ill. App. 2d 915, 271 N.E.2d 399; 3 Ill. L. & Prac. *Appeal and Error* § 802 (1953).

In the matter before us, not only has there been no showing of such injury but, as a matter of fact, defendants have made no assertion that they were prejudiced. They argue only that the court committed plain error, but they cite no authorities in support of this position. From our examination of the record, we do not believe that the error was prejudicial to the extent that reversal is required. Initially, we note that the refusal to allow defendants to show that the economist did not consider deductions for income tax in his computations went only to the question of damages, so that if there was any prejudice therefrom, it would be reflected in the jury's award. In this regard, it is significant that defendants have made no assertion that the award was excessive, and we cannot say that it was, in view of the fact that deceased was only 25 years of age with a life expectancy of 45.6 years and a working life of 37 years and because there was unrebutted testimony of a demonstrated loss of earnings reduced to cash value of from $333,900 to $611,400. Even if testimony as to deductions of income tax had been permitted, there would remain a substantial amount of future loss of earnings which, when considered with the value of the services deceased would have rendered during his life expectancy and the value of his 35 hours of conscious pain and suffering resulting from burns over 89% of his body—of which 80% went through all layers of skin, would indicate a substantial recovery was justified.

In any event, the record discloses that defendants produced no witness who testified as to damages or contradicted plaintiff's evidence in that regard. Neither do defendants contend that the error resulted in an excessive verdict; nor do defendants suggest that an inference of excessiveness should be drawn from the nature of the error. In view thereof, we believe that defendants have not satisfied the required showing of prejudice to entitle them to a reversal.

I would modify the opinion to bring it into accord with the above comments; otherwise, I concur in affirming the judgment of the trial court.